In re HODGE, Sean M. and Hodge, Debra A., husband and wife, Debtors.

MAGIC VALLEY EVANGELICAL FREE CHURCH, INC., an Idaho corporation, Appellant,

v.

L.D. FITZGERALD, Trustee, Appellee.

L.D. FITZGERALD, Trustee, Cross–Appellant,

v.

MAGIC VALLEY EVANGELICAL FREE CHURCH, INC., an Idaho corporation, Cross–Appellee.

United States of America, Intervenor.

Coalition for the Free Exercise of Religion; and the Church of Jesus Christ of Latter–Day Saints, Amici Curiae.

No. 96–0458–E–BLW.

United States District Court, D. Idaho.

April 3, 1998.

Emil F. Pike, Twin Falls, ID, Jay Alan Sekulow, American Center for Law & Justice, Virginia Beach, VA, Benjamin W. Bull, American Center for Law & Justice, Scottsdale, AZ, Barry Peters, Boise, ID, for Magic Valley Evangelical Free Church, Inc.

Daniel Carl Green, Racine, Olson, Nye, Cooper & Budge, Pocatello, ID, for L.D. Fitzgerald.

Stanley Crow, Boise, ID, for Coalition for the Free Exercise of Religion.

D. Marc Haws, Asst. U.S. Atty., U.S. Attorney's Office, Boise, ID, Martha E. Rubio, U.S. Dept. of Justice, for USA.

## OPINION

WINMILL, District Judge.

In this appeal from a decision of the United States Bankruptcy Judge, the Court must consider the following issues: (1) whether the Religious Freedom Restoration Act of 1993 ("RFRA"), codified at 42 U.S.C.

§§ 2000bb–2000bb–4, provides a defense to a bankruptcy trustee's action to recover, for the benefit of the bankruptcy estate, tithing payments made by Chapter 7 debtors, while insolvent, to their church in the two-year period preceding the filing of their bankruptcy petition; (2) if so, whether RFRA is a constitutional limitation upon the reach of federal law; and (3) if RFRA is not a valid defense or is unconstitutional, whether the First Amendment provides a defense to such an action.

## FACTUAL AND PROCEDURAL BACKGROUND

L.D. Fitzgerald ("the Trustee"), the Chapter 7 Trustee of the bankruptcy estate of Debtors Sean and Debra Hodge ("the Hodges"), commenced an adversary proceeding in United States Bankruptcy Court against Magic Valley Evangelical Free Church, Inc. ("the Church"), a non-profit religious corporation founded in 1983, to recover certain payments made by the Hodges to the Church prior to their filing of a joint Chapter 7 bankruptcy petition. The Hodges became members of the Church in 1986 and have since regularly given the Church a portion of their income, in adherence to a religious practice referred to as "tithing." It is these tithing payments that the Trustee seeks to recover on behalf the Hodges' bankruptcy estate.

The Hodges believe tithing to be a biblical obligation. The Trustee does not question the sincerity of this belief, nor does he dispute that tithing is among the Church's central tenets. However, the Church does not condition membership on adherence to the practice of tithing. Instead, it uses tithing payments to fund the services it provides to its congregants, of which both tithing and non-tithing members may partake.

The Hodges filed their bankruptcy petition on May 5, 1995. Over the course of the two years immediately preceding that date, the Hodges made tithing payments to the Church totaling $5,204. By his adversary proceeding, the Trustee sought to "avoid" these tithing payments pursuant to federal and state fraudulent-conveyance statutes.[1] The parties filed cross motions for summary judgment. In support of his motion, the Trustee simply argued that the requirements of the avoidance statutes were met. In support of its motion, the Church argued that those requirements were not met; and, in any event, that both the First Amendment and RFRA trump the avoidance statutes, thereby placing the Hodges' tithing payments out of the Trustee's reach.

The United States Bankruptcy Judge granted the Trustee's motion and denied the Church's motion, holding that the Trustee had satisfied the elements of the avoidance statutes as a matter of law[2], that application of those statutes in this instance would not violate the First Amendment, and that, although their application would violate RFRA, RFRA is unconstitutional. Judgment was entered in favor of the Trustee in the amount of $5,204. Additionally, the Trustee recovered $1,000 in attorney fees.

The Church appealed the Bankruptcy Judge's decision that RFRA is unconstitu-

---

1. The federal fraudulent-conveyance statute at issue is codified at 11 U.S.C. § 548(a)(2). It allows bankruptcy trustees to avoid transfers that occurred a maximum of one year before the filing of a bankruptcy petition. Additionally, through 11 U.S.C. § 544(b), the "strong arm" provision, bankruptcy trustees may invoke the rights provided to creditors by state fraudulent-conveyance statutes. The fraudulent-conveyance statutes of the State of Idaho are codified at Idaho Code §§ 55–913 and 55–914. They apply under much the same circumstances as does 11 U.S.C. § 548(a)(2), except that they permit creditors to avoid transfers made as much as four years before the filing of a bankruptcy petition.

In this case, the Trustee initially sought to invoke the Idaho statutes to their fullest temporal breadth. However, he abandoned his attempt to avoid tithing payments made by the Hodges in the third and fourth years preceding their filing of a bankruptcy petition, conceding that he could not satisfy all of the statutory elements for those years.

Additionally, the Court notes that "fraudulent conveyance" is a misnomer in this instance. To state a claim under either the federal or state statutes, and thereby "avoid" the Hodges' tithing payments to the Church, the Trustee need not demonstrate that the Hodges had any fraudulent intent. Accordingly, the Court will instead refer to them as "avoidance" statutes.

2. The Church does not appeal this particular holding.

tional, that application of the avoidance statutes does not violate the First Amendment, and that the Trustee is entitled to attorney fees. The Trustee cross-appealed the Bankruptcy Judge's determination that recovery of the tithing payments violates RFRA.

Shortly after the filing of this appeal, the Court stayed the appeal to await the Supreme Court's disposition of a Fifth Circuit case, *Flores v. City of Boerne,* 73 F.3d 1352 (5th Cir.1996), in which certiorari had been granted to resolve issues regarding the constitutionality of RFRA. The Supreme Court's decision having been issued, the Court may now proceed to decide this appeal.

In keeping with the prudential rule that federal courts should, if possible, avoid deciding the constitutionality of legislative enactments, *see e.g., United States v. Locke,* 471 U.S. 84, 92, 105 S.Ct. 1785, 1791, 85 L.Ed.2d 64 (1985), the Court must first determine whether RFRA provides the Church a defense to the Trustee's avoidance action.

## THE CHURCH'S RFRA DEFENSE

■ RFRA was enacted by Congress to enhance the level of protection given by law to the free exercise of religion. It sets forth a three-part test to govern whether a particular law permissibly restricts a religious devotee's free-exercise rights. *See* 42 U.S.C. § 2000bb–1. If a law amounts to a "substantial burden" on a person's free exercise of his religion, he need not comply with it unless the law is justified by a "compelling governmental interest" and is the "least restrictive means" of furthering that interest. *Id.*

Until it handed down *Employment Div. v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), the Supreme Court had applied such a "compelling-interest test" in deciding cases arising under the Free Exercise Clause of the First Amendment. As will be discussed at length later in this opinion, *Smith*'s abandonment of that test for one less protective of religious practices was the impetus for the enactment of RFRA. RFRA's purpose was to "restore" the compelling-interest test which had been applied in free-

exercise cases decided before *Smith,* most notably in the cases of *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), and *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). 42 U.S.C. § 2000bb(b)(1). Accordingly, the courts may rely on pre-*Smith* cases in applying RFRA's compelling-interest test. *See Goehring v. Brophy,* 94 F.3d 1294, 1299 (9th Cir.1996). As earlier indicated, the threshold question under this test is whether the law challenged substantially burdens a religious adherent's free exercise of his religion.

### *Substantial Burden*

■ An adherent's free exercise of his or her religion is substantially burdened by a statute that either (1) requires the adherent to refrain from engaging in a practice important to his or her religion, *see Hobbie v. Unemployment Appeals Comm'n,* 480 U.S. 136, 140–41, 107 S.Ct. 1046, 1048–49, 94 L.Ed.2d 190 (1987), or (2) forces the adherent to choose between following a particular religious practice or accepting the statute's benefits. *See Sherbert,* 374 U.S. at 404, 83 S.Ct. at 1794; *Thomas v. Indiana Employment Sec. Div.,* 450 U.S. 707, 717–18, 101 S.Ct. 1425, 1431–32, 67 L.Ed.2d 624 (1981). More fully explained, the latter type of substantial burden occurs where non-adherence to a religious practice is necessary to obtain a statute's benefits; such a statute has an indirect coercive effect on the religious adherent's free exercise. *See Thomas,* 450 U.S. at 719, 101 S.Ct. at 1432–33.

In this case, the Trustee does not dispute that the practice of tithing is central to the Hodges' religion, nor that the Hodges sincerely believe that tithing is required by the Bible.[3] Instead, the Trustee argues that the Hodges' practice of tithing is largely unaffected by the avoidance statutes. The basis for this argument is that the avoidance statutes do not make the Hodges' practice of tithing illegal—the Hodges may making tithing payments to the Church regardless of the avoidance statutes, and only the Church will

---

**3.** The Bankruptcy Judge ruled that the Church has standing to assert the Hodges' rights under RFRA, as well as under the First Amendment, on

their behalf. The Trustee does not appeal this ruling.

be affected by an action to recover the tithing payments. The Trustee's argument has superficial appeal. Indeed, the Church may not tenably argue that the avoidance statutes themselves prevent the Hodges from paying tithing. Instead, to set up a RFRA defense, the Church must demonstrate that the avoidance statutes impermissibly pressure the Hodges to abandon their religious practice of tithing in order to obtain bankruptcy relief.

In response to the Trustee's argument, the Church relies upon affidavits submitted by the Hodges, which attest to their unwillingness to have filed a bankruptcy petition, had they known that doing so would have given rise to this action against the Church. This testimony establishes the existence of some tension between the Hodges' free-exercise rights and their right to bankruptcy relief. The Trustee argues that this tension is not enough to rise to the level of a substantial burden.

At least one bankruptcy court has accepted the Trustee's argument. *See In re Newman*, 183 B.R. 239, 251 (Bankr.D.Kan. 1995). Driving the decision in *Newman* was the assumption that the interplay of the Bankruptcy Code and the avoidance statutes allows debtors to have it both ways; they may follow their religious practice of tithing *and* obtain unrestricted bankruptcy relief. Thus, strictly speaking, debtors need not choose between the religious practice of tithing and obtaining bankruptcy relief. However, this ignores the hard reality that to obtain bankruptcy relief the debtor must choose between making tithing payments while insolvent and subjecting his or her church to a money judgment in the amount of tithing payments so made. Although, as the Trustee put it, "[t]here is absolutely no evidence that protecting their church from a lawsuit by a bankruptcy trustee is a sincerely held religious belief or practice of [the Hodges]," (Pl.'s Appellate Br. at 7), the Court agrees with the Bankruptcy Judge that this undesirable choice has a chilling effect sufficient to constitute a substantial burden on the Hodges' free exercise of their religion.

The threshold question having been answered affirmatively, the Court must proceed to apply the remaining two prongs of RFRA's compelling-interest test.

### Compelling Governmental Interest

RFRA does not expressly define what makes a governmental interest "compelling." However, as earlier indicated, the express intent of the statute is to "restore" the compelling-interest test as set forth in *Sherbert* and *Yoder*. 42 U.S.C. § 2000(bb)(b)(1). Accordingly, the meaning given the term "compelling interest" in those cases, and their progeny, provides the best indication of how it should be defined in construing RFRA in the context of this case.

In *Sherbert*, the Supreme Court declared that only "paramount" governmental interests suffice to permit a limitation upon free exercise rights. *Sherbert*, 374 U.S. at 406, 83 S.Ct. at 1795. The Court put it similarly in *Yoder*: "only those interests of the highest order…can overbalance legitimate claims to the free exercise of religion." *Yoder*, 406 U.S. at 215, 92 S.Ct. at 1533. Thus, it is clear that, for the purposes of RFRA, only governmental interests of grave importance can be considered "compelling." The Supreme Court has found compelling governmental interests in maintaining the tax system, *see Hernandez v. C.I.R.*, 490 U.S. 680, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989), preserving national security, *see Gillette v. United States*, 401 U.S. 437, 91 S.Ct. 828, 28 L.Ed.2d 168 (1971), ensuring public safety, *see Prince v. Massachusetts*, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944), providing public education, *see Yoder, supra*, and enforcing participation in the social security system, *see United States v. Lee*, 455 U.S. 252, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982). By contrast, the Court found no compelling interest in preventing fraud in the unemployment compensation system. *See Sherbert, supra*.

The governmental interests furthered by the avoidance statutes have been described by the parties as (1) maximizing the recovery of a bankruptcy estate's creditors, (2) maintaining the bankruptcy system's current balance between debtors and creditors, and (3) preventing debtors from effecting fraudulent transfers. To evaluate the importance of

these interests, it is necessary to first evaluate whether there is a compelling governmental interest in maintaining the bankruptcy system itself.

▓▓▓▓ The Bankruptcy Code is universally understood to serve two principle ends: (1) ensuring the equitable treatment of the creditors of bankrupt debtors; and (2) providing debtors with a fresh start financially. Our nation's economy depends extensively on the availability of credit to individuals. Hundreds of thousands of bankruptcy petitions are filed each year—most of them by individuals seeking to extinguish or restructure overwhelming debts. Not only do these debtors have a gravely important interest in obtaining a fresh start so that they need not toil the remainder of their years attempting to win an unwinnable battle with crushing debt, *but see United States v. Kras,* 409 U.S. 434, 446–47, 93 S.Ct. 631, 638–39, 34 L.Ed.2d 626 (1973) (holding that debtors have no "fundamental" constitutional right to bankruptcy relief), their creditors have a similarly grave interest in a uniform system of asserting and protecting their rights and in being treated fairly. The flow of consumer credit, the very lifeblood of the national economy, would almost certainly be constricted by the absence of a bankruptcy system comparable to that established by the Bankruptcy Code. Our nation's economic welfare undeniably has come to depend upon ordinary consumers making purchases on credit that are unsecured by collateral. For these reasons, the federal government's interest in maintaining the bankruptcy system is one of the highest order and must, therefore, be regarded as compelling.[4]

▓▓▓ That is not to say, however, that the interests served by the avoidance statutes are compelling as well. To be so, they must be so integral to the bankruptcy system that its ability to carry out its mission would be severely compromised by their absence. In operation, the avoidance statutes serve the laudatory purpose of disallowing insolvent persons from giving away assets during the period immediately preceding bankruptcy, thereby depleting the bankruptcy estate.

They apply regardless of whether the debtor intended to make a transfer to defraud his creditors, based upon the simple premise that if a person's debts exceed his assets, he acts in a manner fundamentally unfair to those who have extended him credit if he gives away what little he has and gets nothing in return. Thus, the avoidance statutes attack not only actual fraud, but also a form of constructive fraud.

With this purpose of the avoidance statutes in mind, the Court turns to the three particular interests listed above. First, the avoidance statutes certainly enhance a creditor's recovery. However, the Bankruptcy Code subordinates the interests of creditors to the interests of debtors and other public policy interests in numerous circumstances. For this reason, maximizing the recovery of creditors cannot be considered an interest of the highest order. *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 547, 113 S.Ct. 2217, 2234, 124 L.Ed.2d 472 (1993) (holding that an interest served by a statute is not compelling where the statutory framework permits derogation of that interest).

Second, there is no compelling interest in maintaining the current balance between debtors and creditors. While some sort of balance is vital, Congress frequently tinkers with that balance in amending the Bankruptcy Code. RFRA, in that it creates what amounts to a free-exercise exception to bankruptcy laws, is just another example of this tinkering. It cannot be said that such an exception does such violence to the current balance as to undermine the bankruptcy system's ability to further its overriding purposes.

▓▓▓▓ Finally, the Court concludes that there may be a compelling interest in preventing transfers motivated by actual fraud. The avoidance statutes provide a significant disincentive for debtors who, realizing that the filing of a bankruptcy petition is imminent, are tempted to disburse their estates to someone other than their creditors. Doubtless, many debtors would prefer to give their

---

4. In reaching this conclusion, the Court notes its disagreement with *In re Young,* 82 F.3d 1407, 1420 (8th Cir.1996), *vacated,* —— U.S. ——, 117 S.Ct. 2502, 138 L.Ed.2d 1007 (1997).

estates to relatives, churches, or charities rather than to their creditors, and the bankruptcy system would have difficulty functioning in the absence of a mechanism to deter this sort of actual fraud. Thus, there may be a compelling interest in preventing such fraudulent transfers. However, the Court need not decide the issue because, as discussed below, the avoidance statutes are not the least restrictive means of preventing transfers motivated by fraudulent intent.[5]

### Least Restrictive Means [6]

If one characterizes the interest served by the avoidance statutes as the prevention of actual fraud, those statutes are not narrowly drawn to further that interest. Although the avoidance statutes attack transfers motivated by fraud, they do not limit their application to such transfers. Instead, as a surrogate for requiring proof of actual fraud, they allow bankruptcy trustees to recover transferred assets and funds by merely proving insolvency on the date of the transfer. In doing so, the avoidance statutes nullify constructively-fraudulent transfers, not just those that amount to actual fraud. For this reason, they are not the least restrictive means of preventing transfers motivated by fraudulent intent. Undoubtedly, the avoidance statutes could have been drafted so as to apply only in instances of actual fraud.[7]

In summary, the Court concludes that the application of the avoidance statutes to the Hodges "substantially burdens" the free exercise of their religious beliefs, and that although the avoidance statutes may be justified by a "compelling governmental interest," they are not the "least restrictive

means" of furthering that interest. Accordingly, the Court determines that RFRA provides a defense to the Trustee's action to recover tithing paid by the Hodges to the Church. Therefore, the Court must address the constitutionality of RFRA.

### IS RFRA CONSTITUTIONAL?

As enacted, RFRA provides that any government, whether federal, state, or local, may substantially burden a person's free exercise of religion only to further a compelling governmental interest and only by the least restrictive means of doing so, even if the burden results from a neutral law of general applicability. 42 U.S.C. §§ 2000bb–1, 2000bb–2. Subsequent to the Bankruptcy Judge's decision, the Supreme Court issued its ruling in *City of Boerne v. Flores,* — U.S. ——, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), which bears significantly on the issue of the constitutionality of RFRA. In *Flores,* the Supreme Court unambiguously held RFRA unconstitutional insofar as it restricts the power of state and local governments. No specific mention was made, however, of whether RFRA continues in force as a valid restriction on the federal government. Needless to say, the Trustee and the Church interpret this omission differently, the interpretation of the latter supported by Intervenor United States of America and amici curiae. The Court will begin its analysis of the constitutionality of RFRA as applied to the federal government by determining the effect of *Flores.*

### The Effect of Flores

The Court began its decision in *Flores* with a review of RFRA's legislative history and

---

5. As earlier noted, the avoidance statutes also trap in their web many transfers not motivated by fraudulent intent. Even though they do so purposefully—based upon the sensible rationale that even non-fraudulent transfers made during a period of insolvency are improper—reaching these non-fraudulent transfers is not vital to the maintenance of the bankruptcy system. The Court has no basis for concluding that transfers made while insolvent, but not motivated by fraud, are so pervasive that the Bankruptcy Code would be unable to serve its lofty purposes without a mechanism to attack them. Thus, the Court holds that the avoidance statutes do not serve a compelling governmental interest by reaching such non-fraudulent transfers.

6. Since the Court has concluded that none of the other interests served by the avoidance statutes might be compelling, the Court reaches only the question of whether those statutes are the least restrictive means of preventing transfers motivated by fraudulent intent.

7. The Court notes that one effect of the avoidance statutes is to permit bankruptcy trustees to avoid transfers motivated by fraudulent intent without having to prove any such motivation. Although removing this difficult burden of proof enhances a bankruptcy trustee's ability to combat actual fraud, it is not the least restrictive means of doing so.

concluded that Congress relied only on Section Five of the Fourteenth Amendment as the source of its power to enact a statute which curtailed the legislative discretion of state and local governments. The majority opinion then considered the history of Section Five, which granted Congress the "power 'to enforce' by 'appropriate legislation' the constitutional guarantee that no State shall deprive any person of 'life, liberty, or property, without due process of law' nor deny any person 'equal protection of the laws.'" *Flores,* —— U.S. at ——, 117 S.Ct. at 2162. However, the Court concluded that Congress's remedial power under Section Five did not extend to reinstating an interpretation of the Free Exercise Clause rejected by the Supreme Court in *Smith.* As the Court stated:

> The design of the Amendment and the text of § 5 are inconsistent with the suggestion that Congress has the power to decree the substance of the Fourteenth Amendment's restrictions on the States. Legislation which alters the meaning of the Free Exercise Clause cannot be said to be enforcing the Clause. Congress does not enforce a constitutional right by changing what the right is. It has been given the power 'to enforce,' not the power to determine what constitutes a constitutional violation. Were it not so, what Congress would be enforcing would no longer be, in any meaningful sense, the "provisions of [the Fourteenth Amendment]."

*Id.* at ——, 117 S.Ct. at 2164. From this, the Court concluded that Section Five of the Fourteenth Amendment did not provide Congress with authority to impose sweeping limitations upon state and local government in the name of the First Amendment. Having reached that decision, it was unnecessary for the Court to go further and consider whether RFRA, as applied to the federal government, was somehow unconstitutional.

The majority opinion was not, however, a model of clarity in delineating its intended scope. The majority's Section Five analysis is both preceded and succeeded by procla-

mations of RFRA's unconstitutionality that appear to be unqualified. Moreover, the opinion concludes with a chastisement of Congress not *necessarily* limited to Congress's overreaching under Section Five:

> Our national experience teaches that the Constitution is preserved best when each part of the government respects both the Constitution and the proper actions and determinations of the other branches. When the Court has interpreted the Constitution, it has acted within the province of the Judicial Branch, which embraces the duty to say what the law is. *Marbury v. Madison,* 1 Cranch [137], at 177, 2 L.Ed. 60 [1803]. When the political branches of Government act against the background of a judicial interpretation of the Constitution already issued, it must be understood that in later cases and controversies the Court will treat its precedents with the respect due them under settled principles, including stare decisis, and contrary expectations must be disappointed. RFRA was designed to control cases and controversies, such as the one before us; but as the provisions of the federal statute here invoke are beyond congressional authority, it is this Court's precedent, not RFRA, which must control.

\*\*\*

> ...Broad as the power of Congress is under [Section Five] of the Fourteenth Amendment, RFRA contradicts vital principles necessary to maintain *separation of powers* and federal balance.

*Flores,* —— U.S. at ——, 117 S.Ct. at 2172 (emphasis added). These statements, according to the Trustee, demonstrate that the majority in *Flores* believed it had invalidated RFRA in its entirety and not merely as applied to state and local governments. The Trustee also suggests it is significant that not one of the six justices who issued opinions indicated that the provisions of RFRA which apply to the federal government would survive the Court's decision.[8] On the other

---

8. It does seem odd that none of justices bothered to note that RFRA was not rendered a complete nullity. In fact, the nearest any opinion came to

expressly recognizing that the case's holding was limited to RFRA's application to state and local governments was the majority's statement that

hand, only Justice Stevens, writing in concurrence, expressed a rationale for invalidating RFRA which applied to the statute's attempt to limit and restrict actions of the federal government. *See id.* at ——, 117 S.Ct. at 2172 (Stevens, J., concurring) (arguing that RFRA violates the Establishment Clause of the First Amendment).

■■ This Court does not believe that the Supreme Court would depart from the firmly-entrenched principle of judicial restraint that constitutional questions are to be decided on the narrowest grounds possible, *see Ashwander v. TVA,* 297 U.S. 288, 347, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936) (Brandeis, J., concurring), especially without making its intentions more explicit.[9] The Trustee's observations regarding the opinions in *Flores* do not, in truth, counsel toward the conclusion that the Court invalidated RFRA in its entirety. The above passage from the majority's opinion is more soundly read as a criticism of Congress's intent to bind the states with its own reading of the Free Exercise Clause. For these reasons, the Court holds that RFRA survived *Flores,* albeit only in the federal realm, and continues to apply there, absent some other constitutional infirmity.

■ The Trustee argues three such infirmities: (1) that RFRA violates the separation-of-powers doctrine; (2) that it is not grounded in any of Congress's enumerated powers; and (3) that it offends the Establishment Clause. The Court will next address each argument in turn, mindful that in analyzing the constitutionality of an enactment of Congress, the Court must begin by presuming it to be valid. *See United States v. National Dairy Prods. Corp.,* 372 U.S. 29, 32, 83 S.Ct. 594, 597–98, 9 L.Ed.2d 561 (1963).

*Separation of Powers*

Congress enacted RFRA in response to *Employment Division v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), which, in the minds of some, reduced the level of protection given to the free exercise of religion in comparison to that provided by the Supreme Court's earlier decisions. The *Smith* Court expressly rejected prior holdings that governmental bodies could not apply neutral laws of general applicability so as to "substantially burden" religious practices without "compelling justification," finding such a rule to be unworkable in the context of the Free Exercise Clause. *See Smith,* 494 U.S. at 882–90, 110 S.Ct. at 1601–06.

---

RFRA's most far-reaching provisions are those that apply to the states. *See id.* at ——, 117 S.Ct. at 2162.

9. The Trustee argues that the Supreme Court's intention in *Flores* to do just that is demonstrated by its disposition of *Christians v. Crystal Evangelical Free Church,* —— U.S. ——, 117 S.Ct. 2502, 138 L.Ed.2d 1007 (1997). In *Christians,* the justices unanimously and summarily vacated the Eighth Circuit's decision to apply RFRA as a defense to a bankruptcy trustee's attempted recovery of tithing payments under 11 U.S.C. § 548(a)(2). The Court remanded the case, stating only that further consideration was necessary in light of *Flores.*

In response to the Court's request for briefing on the insight, if any, *Christians* provides as to the meaning of *Flores,* the United States responded by characterizing *Christians* as an instance of "GVR," a docket practice of the Supreme Court that typically affords little inference that the judgment vacated was improper in the minds of the justices. "GVR" is an acronym of sorts, derived its components of granting certiorari, vacating the lower court's judgment, and remanding the case for reconsideration in light of a

recent Supreme Court opinion. Issuance of a GVR does not amount to a decision on the merits of a case; instead, it indicates that the Supreme Court views intervening precedent as sufficiently important to, and perhaps determinative of, the proper disposition of the case to make reconsideration in its light appropriate. *See Henry v. City of Rock Hill,* 376 U.S. 776, 777, 84 S.Ct. 1042, 1043, 12 L.Ed.2d 79 (1964). Put differently, a GVR can be understood as if Supreme Court had flagged the case as one upon which the intervening precedent could possibly have bearing. *See Bush v. Lucas,* 647 F.2d 573, 575 (5th Cir.1981).

Thus, it appears that *Christians* says little about the Supreme Court's view of whether RFRA remains alive in the federal realm. It merely indicates the Court's view that *Flores* has *possible* implications for that issue. As the Ninth Circuit artfully put it, "[t]rying to distill meaning" from a GVR is "like reading tea leaves." *See Ostrofe v. H.S. Crocker Co., Inc.,* 740 F.2d 739, 748 (9th Cir.1984). This Court would read too much into *Christians* by considering it a definitive indicator of the Supreme Court's intention in *Flores,* especially where doing so would precipitate the conclusion that the Supreme Court ignored a settled principle of judicial restraint.

The compelling-interest test in the free-exercise arena finds its strongest roots in *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), and *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). Over the 27-year period between *Sherbert* and *Smith,* however, this seemingly rigorous test proved to be a paper tiger. As Justice Scalia noted in the Court's opinion in *Smith,* outside of *Sherbert* and *Yoder,* the Supreme Court invalidated a governmental action by applying the compelling-interest test only three times, all of them in unemployment-compensation cases. *Id.* at 883, 110 S.Ct. at 1602–03. Although the Supreme Court purported to apply the test in other contexts, it *"always* found the test satisfied." *Id.* (emphasis added). The Supreme Court's growing dissatisfaction with the test became more apparent in the 1980s, when it did not apply the test in at least four free-exercise cases decided during that decade. *See id.* at 883–84, 110 S.Ct. at 1602–03 (citing *Bowen v. Roy,* 476 U.S. 693, 106 S.Ct. 2147, 90 L.Ed.2d 735 (1986); *Lyng v. Northwest Indian Cemetery Protective Assn.,* 485 U.S. 439, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988); *Goldman v. Weinberger,* 475 U.S. 503, 106 S.Ct. 1310, 89 L.Ed.2d 478 (1986); *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987)). Thus, the decision in *Smith* was the culmination of 27 years of frustration in attempting to apply a well-intended test which had proven to be unworkable.

The Court in *Smith* identified philosophical, as well as practical, difficulties with applying the compelling-interest test, noting that it creates the "constitutional anomaly" of a "private right to ignore generally applicable laws." *Id.* at 886, 110 S.Ct. at 1604. Additionally, Justice Scalia observed that rigorous and honest application of the compelling-interest test in the free-exercise context would be tantamount to "courting anarchy" because of the sheer diversity of religious beliefs held by Americans. *Id.* As he put it, "we cannot afford the luxury of deeming

*presumptively invalid,* as applied to the religious objector, every regulation of conduct that does not protect an interest of the highest order." *Id.* (emphasis in original). For these reasons, the Supreme Court discarded the compelling-interest test in cases in which religious adherents challenge neutral laws of general applicability.

Congress, in adopting RFRA, very openly disagreed with *Smith.* With interesting candor, Congress included in RFRA's preamble a criticism of *Smith* and identified its purpose in enacting RFRA as being "to restore the compelling interest test as set forth in Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) and Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) and to guarantee its application in all cases where free exercise of religion is substantially burdened. . . ." 42 U.S.C. § 2000bb. The Bankruptcy Judge, without the benefit of *Flores,* and in reliance upon the statute's candid preamble, held RFRA unconstitutional as an improper attempt to legislatively overrule the Supreme Court's interpretation of the First Amendment and to expand its meaning. As he put it, "[w]hile the legislative history [10] [of RFRA] suggests a purpose of supplementing the Court's interpretation of the First Amendment in *Smith,* the express terms of the statute forthrightly declare its purpose is to restore the precise test rejected by the Supreme Court in *Smith* as the rule of decision in cases implicating the First Amendment." *In re Hodge,* 200 B.R. 884, 900–01 (Bankr.D.Idaho 1996) (footnote added). The Bankruptcy Judge went on to find that, through RFRA, Congress attempted to instruct federal courts as to the proper interpretation of the Free Exercise Clause. Because the requirement for invoking RFRA is identical to that for invoking the Free Exercise Clause, "RFRA will only come into play in those situations already addressed by the Constitution itself, and not in circumstances not governed by the Free Exercise Clause." *Id.* at 901. In *Smith,* the Supreme Court

---

**10.** RFRA's legislative history contains a passage that expresses Congress's intent in enacting RFRA not to literally overturn *Smith,* but instead to create a new statutory right protecting free exercise beyond that offered by the First Amend-

ment. The Bankruptcy Judge viewed this statement to lack candor in light of the statute's express statement of dissatisfaction with *Smith* and purpose of restoring pre-*Smith* law in all free-exercise cases.

dictated the proper standard for reviewing a free-exercise claim. The Bankruptcy Judge considered RFRA in no uncertain terms to supplant this standard with Congress's own. As such, he found that Congress sought "not merely to enhance the protections afforded by the First Amendment, but to define them," thereby usurping the power of the Supreme Court. *Id.*

The Court respectfully disagrees with this aspect of the Bankruptcy Judge's decision. It has long been the law of the land that Congress may permissibly create new statutory rights giving greater protection to constitutionally-protected interests than the Constitution itself does. Congress has frequently responded to constitutional decisions of the Supreme Court by doing just that. Examples abound. In response to *Zurcher v. Stanford Daily*, 436 U.S. 547, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978), which held that the Fourth Amendment gives publishers no special protection against police searches, Congress enacted the Privacy Protection Act of 1980, codified at 42 U.S.C. § 2000aa, to provide for such special protection. After the Supreme Court in *Geduldig v. Aiello*, 417 U.S. 484, 94 S.Ct. 2485, 41 L.Ed.2d 256 (1974), held that discrimination on the basis of pregnancy did not amount to sex discrimination in violation of the Equal Protection Clause, Congress enacted the Pregnancy Discrimination Act of 1978, codified at 42 U.S .C. § 2000e(k), to protect pregnant women against discrimination. Following the Supreme Court's decision in *Goldman v. Weinberger*, 475 U.S. 503, 106 S.Ct. 1310, 89 L.Ed.2d 478 (1986), which held that soldiers have no constitutional right to wear religious headgear, Congress created such a statutory right, codified at 10 U.S.C. § 774. The Supreme Court has never hinted that Congress exceeded its power in enacting these and other new statutory rights.[11] Indeed, the Supreme Court has openly indicated that it sanctioned Congress's attempt to "legislatively overrule" *Goldman* in this manner. *See Texas Monthly, Inc. v. Bullock*, 489 U.S. 1, 18 n. 8, 109 S.Ct. 890, 901 n. 8, 103 L.Ed.2d 1 (1989).

Congress did much the same thing in enacting RFRA. No doubt, Congress disliked the level of constitutional protection of free exercise afforded by *Smith.* In response, it provided statutory protection above and beyond the constitutional floor set by *Smith.* From a separation-of-powers perspective, there is no hint of impropriety in this.

■ The main distinction between RFRA and the enactments mentioned above is that RFRA is broad in its application, affecting any governmental action where the protections offered by the Free Exercise Clause are implicated. To employ an overused, but apt, phrase, this is a distinction without a difference. There is no separation-of-powers requirement that Congress may only legislate narrowly. Even though Congress disagreed with the interpretation of the Free Exercise Clause set forth in *Smith* as overly narrow, it could, and did, permissibly act to supplement free-exercise rights without legislatively overruling *Smith.* Accordingly, the Court reverses the Bankruptcy Judge's holding that Congress violated the separation-of-powers doctrine in enacting RFRA.[12]

As always, however, Congress is constrained in that it must be able to ground its enactment in a constitutionally-enumerated power. The Court will next examine whether RFRA is properly grounded in one of those powers.

*Is RFRA Grounded in One of Congress's Enumerated Powers?*

■ As earlier mentioned, RFRA's legislative history reveals Section Five of the

---

11. This statement is true insofar as Congress had some enumerated power upon which to base its legislation. Even in this context, Congress must undoubtedly rely upon such a power to validly enact laws. The Court will later examine whether RFRA is properly grounded in one or more of Congress's enumerated powers.

12. Because the Trustee made no challenge to the sincerity of the Hodges' religious belief in the practice of tithing or to its centrality to their faith, the Court has no occasion to determine whether RFRA violates the separation-of-powers doctrine by requiring judicial evaluation of the Hodges' sincerity of belief and the importance of a particular religious practice in a manner in which *Smith* determined the courts to be incapable.

Fourteenth Amendment to be the only basis for enactment contemplated by Congress. Nevertheless, the Church, the United States, and amici curiae argue that it is a constitutionally-permissible exercise of Congress's power under the Bankruptcy Clause, as extended by the Necessary and Proper Clause. While it is fatuous to argue, as the Trustee points out, that Congress actually relied on the Bankruptcy Clause in enacting RFRA, that fact is not controlling. "The question of constitutionality of action taken by Congress does not depend on recitals of the power which it undertakes to exercise." *Woods v. Cloyd W. Miller Co.*, 333 U.S. 138, 145, 68 S.Ct. 421, 424–25, 92 L.Ed. 596 (1948). Regardless of the absence of such recitals in a statute's legislative history, it will be upheld so long as Congress had authority "as an objective matter" to enact it. *Crawford v. Davis*, 109 F.3d 1281, 1283 (8th Cir.1997). Thus, RFRA will be upheld in this regard if Congress had the authority to enact it under any enumerated power.

The Trustee correctly recognizes that RFRA's effects in the federal realm are in no way limited to the Bankruptcy Code. Moreover, the Court is aware of nothing in the legislative history of RFRA which would indicate that Congress specifically considered or desired any particular effect of its application in the bankruptcy arena. From these facts, the Trustee reasons that RFRA cannot be properly grounded on the Bankruptcy Clause. He asserts that RFRA is unprecedented in that it " 'reveals its enumerated powers basis only upon application in each particular case.' " (Pl.'s Appellate Br. at 17, quoting Marci A. Hamilton, *The Religious Freedom Restoration Act: Letting the Fox into the Henhouse under Cover of Section 5 of the Fourteenth Amendment*, 16 Cardozo L.Rev. 357, 366 (1994).) Even if this assertion is true, the Court sees no necessary constitutional infirmity in enacting a broad statute protective of a constitutionally-recognized interest that requires situational inquiries into its enumerated-powers basis.

Indeed, the general nature of RFRA provides an unassailable argument that it is within Congress's enumerated powers. RFRA, in effect, amends all federal laws to provide enhanced protection for the free exercise of religion. In so doing, it is properly grounded in the enumerated powers upon which Congress relied in enacting those laws. Congress could have achieved the same result by individually amending each federal statute, and no one would seriously question whether Congress had the authority to amend legislation which it had the authority to adopt in the first instance. The Court is aware of no reason that prohibits Congress from achieving on a wholesale basis what it is clearly empowered to do on a statute-by-statute basis.

■■■ Turning to RFRA's specific application here, it is clear that Congress acted within its enumerated powers. The effect of RFRA is to amend the Bankruptcy Code in a wholesale fashion to prevent a religious devotee's free exercise from being substantially burdened, unless the burden furthers a compelling governmental interest by the least restrictive possible means. Congress's power under the Bankruptcy Clause is "plenary." *Kras*, 409 U.S. at 447, 93 S.Ct. at 639. Moreover, it is augmented by the Necessary and Proper Clause, which affords Congress the power to enact any statute having a "rational nexus...between the content of a specific power in Congress and the action of Congress in carrying that power into execution." *Perez v. Brownell*, 356 U.S. 44, 58, 78 S.Ct. 568, 576, 2 L.Ed.2d 603 (1958). Under these standards, it is certainly within the power of Congress under the Bankruptcy Clause to amend the Bankruptcy Code to ensure that it provides the level of protection the Congress deems adequate for free-exercise rights. Accordingly, the Court holds that RFRA, as applied in this instance, is a proper exercise of Congress's power under the Bankruptcy Clause.

The Trustee raises one additional challenge to the constitutionality of RFRA—that it offends the Establishment Clause of the First Amendment. The Court now turns to that challenge.

399

## The Establishment Clause [13]

There is no question that RFRA, even when limited to actions of the federal government, constitutes a substantial accommodation to religious institutions and beliefs. It effectively amends all actions of the federal government having the force of law to include a requirement that they do not apply if they substantially burden a devotee's free exercise of his or her religion, unless the burden is justified by a compelling governmental interest and is imposed by the least restrictive possible means. The Supreme Court, of course, " 'has long recognized that the government may (and sometimes must) accommodate religious practices and that it may do so without violating the Establishment Clause.' " *Corporation of Presiding Bishop v. Amos,* 483 U.S. 327, 334, 107 S.Ct. 2862, 2867, 97 L.Ed.2d 273 (1987) (quoting *Hobbie v. Unemployment Appeals Comm'n,* 480 U.S. 136, 144–45, 107 S.Ct. 1046, 1051, 94 L.Ed.2d 190 (1987) (footnote omitted)). However, there are limits. Although "[t]here is ample room under the Establishment Clause for 'benevolent neutrality which will permit religious exercise to exist without sponsorship and without interference,' " *id.* (quoting *Walz v. Tax Comm'n of New York City,* 397 U.S. 664, 669, 90 S.Ct. 1409, 1412, 25 L.Ed.2d 697 (1970)), "[a]t some point, accommodation may devolve into 'an unlawful fostering of religion.' " *Id.* (quoting *Hobbie,* 480 U.S. at 145, 107 S.Ct. at 1051). Because of RFRA's breadth, it may well define the extreme limits of Congress's power to accommodate religion without offending the Establishment Clause.

The boundary between permissible accommodation and impermissible fostering of religion does not appear as an unwavering, bright line. More than 50 years ago, the Supreme Court articulated its view that the Establishment Clause precludes the Federal Government from passing laws "which aid one religion, which aid all religions, or prefer one religion over another." *Everson v. Board of Ed. of Ewing,* 330 U.S. 1, 15, 67 S.Ct. 504, 511, 91 L.Ed. 711 (1947). The bedrock constitutional principle set forth in *Everson* disallowing government from passing laws that aid all religions is one from which the Supreme Court "has not strayed." *Lee v. Weisman,* 505 U.S. 577, 609–10, 112 S.Ct. 2649, 2667, 120 L.Ed.2d 467 (1992) (Souter, J., concurring). Its roots lie partly in the belief of the framers of the First Amendment, particularly James Madison and Thomas Jefferson, that "[r]eligion flourishes in greater purity, without than with the aid of Gov[ernment]." *Lee,* 505 U.S. at 608, 112 S.Ct. at 2666 (Blackmun, J., concurring) (quoting Memorial and Remonstrance against Religious Assessments (1785), in *The Complete Madison* 300, 309 (S. Padover ed.1953)).

██ However, the purity of the Establishment Clause's command that we maintain a "wall of separation between church and State," *see Everson,* 330 U.S. at 16, 67 S.Ct. at 512, becomes somewhat diffuse and less certain when applied to the myriad circumstances in which religion and government interact. In an attempt to provide concrete guidance, the Supreme Court, in *Lemon v. Kurtzman,* 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111–12, 29 L.Ed.2d 745 (1971), established a three-pronged test which a statute must pass in order to satisfy the Establishment Clause: (1) the statute must have a secular legislative purpose; (2) its primary effect must neither advance nor inhibit religion; and (3) it must not foster excessive entanglement with religion.[14] The *Lemon* test is not without its critics.[15] Nevertheless,

13. Because of his holding that RFRA is unconstitutional as a violation of the separation-of-powers doctrine, the Bankruptcy Judge did not address whether it violates the Establishment Clause.

14. Recently, the Court has applied the *Lemon* test so that its third prong collapses into its second. Thus, whether a statute produces excessive government entanglement with religion is now a portion of the inquiry into its effect. *See*

*Agostini v. Felton,* ── U.S. ──, ──, 117 S.Ct. 1997, 2015, 138 L.Ed.2d 391 (1997).

15. The *Lemon* test is considered by some to be inadequate to govern the entire spectrum of Establishment Clause cases, and it has been suggested that this dissatisfaction has resulted in a "slide away from *Lemon*'s unitary approach [that] is well under way," *Board of Ed. of Kiryas Joel Village Sch. Dist. v. Grumet,* 512 U.S. 687, 721, 114 S.Ct. 2481, 2500, 129 L.Ed.2d 546

the Supreme Court has never abandoned the *Lemon* test, but instead reaffirmed its commitment to the inquiries required by *Lemon* as recently as last year. *See Agostini v. Felton,* — U.S. ——, ——, 117 S.Ct. 1997, 2010, 138 L.Ed.2d 391 (1997). Thus, it must provide the framework for any inquiry as to whether RFRA violates the Establishment Clause.

■ If one applies the *Lemon* test literally, it seems clear that RFRA fails to satisfy the first two prongs of that test. For example, the statute appears to have no secular purpose. On its face, RFRA provides that its purposes are (1) to restore the compelling interest test of *Sherbert* and *Yoder* to cases involving the free exercise of religion, and (2) to provide a claim or defense to persons whose religious exercise is substantially burdened by government. 42 U.S.C. § 2000bb(b). The unquestioned objective of RFRA is to provide religious adherents, and only religious adherents, with a defense to any neutral law of general applicability. In achieving that objective, the statute also appears to violate the second prong of *Lemon,* since its clear effect is to advance religion. Thus, a literal view of the *Lemon* test suggests that RFRA violates the Establishment Clause.

However, the *Lemon* test must be applied with the judicial gloss which has been placed upon it by subsequent decisions of the Supreme Court. Of primary importance is the Court's decision in *Corporation of the Presiding Bishop v. Amos,* 483 U.S. 327, 107 S.Ct. 2862, 97 L.Ed.2d 273 (1987). In *Amos,* the Supreme Court upheld Title VII's exemption for religious organizations from the statute's prohibition on religious discrimination. 42 U.S.C. § 2000e–1. Initially, the Court rejected the suggestion of the appellants that the three-part *Lemon* approach not be applied to judge the constitutionality of the statute in question, since exemption statutes, like 42 U.S.C. § 2000e–1 or RFRA, will always have the effect of advancing religion and hence be invalid under the *Lemon* test. *Amos,* 483 U.S. at 335, 107 S.Ct. at 2868. The Court then provided an interpretation of the *Lemon* test which depended less on the literal language of the test, than upon its philosophical underpinnings.

With regard to the requirement that the law at issue serve a "secular legislative purpose," the Court indicated that

[t]his does not mean that the law's purpose must be unrelated to religion—that would amount to a requirement "that the government show a callous indifference to religious groups," *Zorach v. Clauson,* 343 U.S. 306, 314, 72 S.Ct. 679, 684, 96 L.Ed. 954 (1952), and the Establishment Clause has never been so interpreted. Rather, *Lemon's* "purpose" requirement aims at preventing [Congress] from abandoning neutrality and acting with the intent of promoting a particular point of view in religious matters.

*Id.* at 335, 107 S.Ct. at 2868. Under this view of *Lemon* the Court made clear that it is a "permissible legislative purpose to alleviate significant governmental interference with the ability of religious organizations to define and carry out their religious missions." *Id.* Arguably, the same language could be applied here in the context of individual beliefs, since the stated purpose of RFRA is to prevent government interference with the individual's free exercise of his or her religious beliefs.

With regard to *Lemon's* second prong, which required that the law in question have a purpose which does not advance religion, the Court explained that "[a] law is not unconstitutional simply because it *allows* churches to advance religion, which is their very purpose. For a law to have forbidden "effects" under *Lemon,* it must be fair to say that the *government itself* has advanced religion through its own activities and influence." *Id.* at 337, 107 S.Ct. at 2869. Again, it is at least arguable that RFRA, like the Title VII exemption provisions at issue in *Amos,* satisfies the second prong of *Lemon* since its purpose is to permits churches and religious adherents to advance their own religious activities and beliefs by preventing or minimizing interference with religious freedom.

(1994) (O'Connor, J., concurring in part and concurring in the judgment).

The Court concluded that the statute in question did not violate the third prong in *Lemon* since religious exemption statutes tend to decrease governmental involvement in religion. *See id.* at 339, 107 S.Ct. at 2870. RFRA, as a broad exemption statute, would appear to likewise satisfy the third prong of the *Lemon* test.

Finally, the Court rejected a more generalized argument that the Title VII exemption violated the Establishment Clause because it singled out religious entities for a benefit. In so doing, the Court observed that "where ... the government acts with the proper purpose of lifting a regulation that burdens the exercise of religion we see no reason to require that the exemption come packaged with benefits to secular entities." *Id.* at 338, 107 S.Ct. at 2869. This language would appear to provide a response to any argument that RFRA violates the Establishment Clause because it favors religious beliefs and activities over philosophies and practices not grounded in religious belief.

Given the decision in *Amos,* it is perhaps unsurprising that each of the Courts of Appeals which have considered whether RFRA violates the Establishment Clause has concluded that it does not. *See Flores v. City of Boerne,* 73 F.3d 1352, 1364 (5th Cir.1996); *EEOC v. Catholic Univ.,* 83 F.3d 455, 470 (D.C.Cir.1996); *Sasnett v. Sullivan,* 91 F.3d 1018, 1022 (7th Cir.1996); *Mockaitis v. Harcleroad,* 104 F.3d 1522, 1530 (9th Cir.1997). However, it is noteworthy that these decisions do little more than cite to *Amos* and to each other in support of their position that RFRA does not violate the Establishment Clause. None of the decisions critically examine whether *Amos* can or should be extended to an exemption statute with the breadth and scope of RFRA. None of the decisions consider whether a statute which exempts religious adherents from compliance with neutral laws of general applicability may implicate Establishment Clause concerns not suggested by the narrow exemption from Title VII which was at issue in *Amos.* None of the decisions consider whether the extension of the holding in *Amos* to RFRA may well make the *Lemon* test so amorphous and distorted that it has no further utility in analyzing accommodation issues under the First Amendment. Finally, none of the decisions pause to examine any other case decided by the Supreme Court under the Establishment Clause in the 50 years or so since *Everson* laid down a fundamental principle of constitutional law from which the Court "has not strayed"—that Congress may not pass laws in aid of all religions. *Lee,* 505 U.S. at 609–10, 112 S.Ct. at 2667–68 (Souter, J., concurring).[16] Nevertheless, the lack of serious discussion of these issues does not detract from the weight of the authority arrayed in support of the proposition that RFRA does not violate the Establishment Clause. Given that authority, and particularly the recent decision of the Ninth Circuit Court of Appeals in *Mockaitis v. Harcleroad,* 104 F.3d at 1530, the Court concludes that RFRA passes constitutional muster under *Lemon* and *Amos.*

## ATTORNEY FEES AND COSTS

The Trustee, as the prevailing party below, was awarded attorney fees in the amount of $1,000 and costs in the amount of $991.49 by order of the Bankruptcy Judge. The fees-and-costs order, however, did not specify the basis for the award. However, regardless of the basis for the award, it must be set aside, given the Court's decision reversing the Bankruptcy Judge's determination that RFRA is unconstitutional.

## ORDER

In accordance with the views expressed in the foregoing Opinion,

---

**16.** Of particular relevance are *Estate of Thornton v. Caldor, Inc.,* 472 U.S. 703, 105 S.Ct. 2914, 86 L.Ed.2d 557 (1985), and *Texas Monthly, Inc. v. Bullock,* 489 U.S. 1, 109 S.Ct. 890, 103 L.Ed.2d 1 (1989) (striking down an exemption from a state sales tax afforded only to religious periodicals because it was not extended to comparable secular periodicals), the latter of which was handed down after *Amos* and therefore supersedes it to the extent that they conflict. To the extent that it is difficult to hold RFRA unconstitutional considering only *Amos,* it is equally difficult to hold it constitutional considering only *Caldor* and *Texas Monthly.* All of these cases must be addressed in any serious examination of this issue.

NOW THEREFORE IT IS HEREBY ORDERED, that the decision of the United States Bankruptcy Judge shall be, and the same is hereby, REVERSED.

IT IS FURTHER ORDERED, that Civil Case Nos. 96–458–E–BLW and 96–450–S–BLW shall be REMANDED, to the Bankruptcy Court for further proceedings consistent with this decision.