# Application of the Religious Freedom Restoration Act to the Award of a Grant Pursuant to the Juvenile Justice and Delinquency Prevention Act

The Religious Freedom Restoration Act is reasonably construed to require the Office of Justice Programs to exempt World Vision—a religious organization that has been awarded a grant under the Juvenile Justice and Delinquency Prevention Act—from the religious nondiscrimination provision in 42 U.S.C. § 3789d(c)(1).

June 29, 2007

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
OFFICE OF JUSTICE PROGRAMS

World Vision, Inc., is a religious organization that has been awarded a $1.5 million grant by the Office of Justice Programs ("OJP") pursuant to the Juvenile Justice and Delinquency Prevention Act of 1974 ("JJDPA"), Pub. L. No. 93-415, 88 Stat. 1109 (codified as amended at 42 U.S.C. §§ 5601–5792a (2000 & Supp. III 2003)). As a condition of receiving grants pursuant to the JJDPA, recipients must refrain from discriminating on the basis of religion in "employment in connection with any programs or activity" funded by the grant. 42 U.S.C. § 3789d(c)(1) (2000). You have asked whether the Religious Freedom Restoration Act ("RFRA")—which prohibits the government from "substantially burden[ing]" religious exercise unless that burden "is the least restrictive means of furthering [a] compelling governmental interest," 42 U.S.C. § 2000bb-1(b) (2000)—requires OJP to exempt World Vision from the religious nondiscrimination provision. We conclude that RFRA is reasonably construed to require that such an accommodation be made for World Vision, and that OJP would be within its legal discretion, under the JJDPA and under RFRA, to exempt World Vision from the religious nondiscrimination requirement of section 3789d(c)(1).[1]

## I.

### A.

World Vision is "a Christian relief and development organization founded in 1950." Letter for Marie E. Burke, Office of Justice Programs, from Brian K. Vasey, Associate General Counsel, World Vision, Inc., *Re: World Vision Earmark Award* at 2 (Sept. 8, 2005) ("Sept. 8 Letter"). Its stated mission is "to love and serve those in need as a demonstration of [its] faith, and the example of Christ." *Id.* at 2–3. By its own account, World Vision is "a thoroughly religious organization." Letter for Charles Moses and Marie Burke, Office of Justice Programs, from

---

[1] This opinion memorializes advice that we provided to you orally in May 2006.

Brian K. Vasey, Associate General Counsel, World Vision, Inc., *Re: World Vision Congressional Earmark Award* at 2 (Sept. 23, 2005) ("Sept. 23 Letter").

World Vision operates projects both domestically and abroad. Domestically, it has focused on "at-risk youth" through its "Vision Youth Program." Sept. 8 Letter at 3. This program serves "at-risk youth" in various communities by meeting their "basic needs," pairing them with mentors, and providing job training and academic tutoring. *Id.*; Congressional Earmark Submission to Office of Justice Programs from World Vision, Inc. ("Grant Application"), att. 2, Program Narrative at 6–10 (May 26, 2005). The program serves beneficiaries regardless of their religious affiliation. Sept. 8 Letter at 3. It "do[es] not proselytize, and no government funds are ever used for religious activities." *Id.*

Since its founding, World Vision has made it a policy to hire only "Christian staff to assist with the mission of the organization." *Id.* at 2. World Vision states that it has done so in order to "maintain [its] identity and strength, which [are] at the core of [its] success," *id.* at 3, and because it "can only remain true to [its] vision if [it] ha[s] the freedom to select like-minded staff, which includes staffing on a religious basis," Sept. 23 Letter at 1. World Vision states that the work of the Vision Youth program is "very staff intensive." *Id.* at 2. Its staff—all of whom "share a faith, passion and commitment to [World Vision's] mission"—works closely with local volunteers and churches to meet the needs of at-risk youth. *Id.*[2]

## B.

In the Consolidated Appropriations Act, 2005, Congress appropriated $102,177,000 to the Department of Justice "for demonstration projects, as authorized by sections 261 and 262 of [the JJDPA]." Pub. L. No. 108-447, 118 Stat. 2809, 2866 (2004) ("2005 Appropriations Act"). Sections 261 and 262 of the JJDPA permit the Department to make grants to organizations that are working toward "the prevention, control, or reduction of juvenile delinquency." 42 U.S.C. §§ 5665–5666 (Supp. III 2003). The conference report accompanying the 2005 Appropriations Act states that "OJP is expected to review the following proposals, [and] provide grants if warranted." H.R. Rep. No. 108-792, at 769 (2004). Included among the listed proposals was "$1,500,000 for World Vision for at-risk youth programs." *Id.* at 771.

OJP thereafter solicited and received a grant application from World Vision, which requested $1,479,965 to continue funding the Vision Youth Program

---

[2] We have had no contact with World Vision representatives and are not in a position to assess the sincerity of its professions about its religious belief and motivations or the accuracy of its factual representations about the organization and the two programs at issue. We therefore accept, for purposes of this memorandum, the accuracy of such representations in its letters and grant submission, in the understanding that review of such representations is ordinarily undertaken during the grant-making process.

("Vision Youth: Transforming the Lives of At-Risk Youth") and to initiate a new project called the "World Vision Northern Virginia Community Mobilization Initiative" ("Community Mobilization Initiative"). The Vision Youth Program seeks "to transform the lives of high-risk young people in eight locations across the country" by facilitating "one-on-one mentoring, educational enhancement, and life-skills training for at-risk children and youth." Grant Application, att. 2, Program Narrative at 1. The grant would fund a portion of the salary and benefits of fourteen existing World Vision employees, each of whom would spend part of his or her time managing the Vision Youth Program funded by the grant. *Id.*, att. 1, Budget Narrative at 1. Those employees oversee the training of Youth Outreach Workers to implement the Vision Youth Program in local communities. *Id.*; *see also id.*, att. 2, Program Narrative at 7. The Youth Outreach Workers, in turn, recruit and train volunteers from local faith-based organizations, "forming a critical mass of supportive adults around these [at-risk] young people." *Id.*, att. 2, Program Narrative at 7.

The Community Mobilization Initiative would seek to "address the escalating gang presence and related violence and criminal activities in the Northern Virginia metropolitan region." *Id.* at 13. Like the Vision Youth program, the new initiative would "provid[e] mentoring to youth at-risk for gang involvement, build[] relationships with youth currently involved in gang activity, provid[e] training and workshops for families and the communities, and provid[e] alternative activities for youth at-risk for gang involvement." *Id.* at 16. The grant would fund all or part of the salary and benefits of eight World Vision employees assigned to the anti-gang initiative. *Id.*, att. 1, Budget Narrative at 1–2. Those employees would work with local law enforcement, schools, and social service agencies "to identify concentrations of young people who are either in or vulnerable to recruitment by local gangs." *Id.*, att. 2, Program Narrative at 18. In particular, they would initiate a "Neighborhood Transformation Project" and a "Community Outreach Campaign" to counteract gang formation and gang violence. *Id.* at 19–20.

OJP awarded World Vision the full amount of its request. Approximately $713,110, or 48% of the grant funds, pays all or a portion of the salary and benefits of World Vision employees on the two projects. *Id.*, att. 1, Budget Narrative at 1. The balance covers travel expenses, supplies, consultant fees, and other miscellaneous expenses. *Id.* at 1–5. For the relevant fiscal year, the grant represents approximately 10% of the entire budget for World Vision's domestic community-based programs, and approximately 75% of the public funding the organization is receiving for domestic operations. Sept. 23 Letter at 2.

## C.

This grant, like all grants under the JJDPA, is subject to 42 U.S.C. § 3789d(c), the nondiscrimination provision of the Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, 82 Stat. 197 (the "Safe Streets Act"). 42 U.S.C.

§ 5672(b) (2000) ("Section[] 3789d(c) . . . shall apply with respect to the administration of and compliance with this chapter"). That provision states that "[n]o person in any State shall on the ground of . . . religion . . . be subjected to discrimination under or denied employment in connection with any programs or activity funded in whole or in part with funds made available under this chapter." 42 U.S.C. § 3789d(c)(1).

After approving the grant, OJP informed World Vision that it was subject to the religious nondiscrimination provision of the Safe Streets Act. Letter for Kimberlee LaGree Ross, World Vision, Inc., from Michael L. Alston, Director, Office for Civil Rights, Office of Justice Programs at 2 (Aug. 16, 2005). OJP noted that, "[c]onsequently, in many circumstances, it would be impermissible for faith-based organizations seeking or receiving funding authorized by these statutes to have policies or practices that condition hiring and other employment-related decisions on the religion of applicants or employees." *Id.*

In response, World Vision "requested relief under the Religious Freedom and [sic] Restoration Act of 1993." Sept. 23 Letter at 1.[3]

## II.

Congress enacted the Religious Freedom Restoration Act in 1993, Pub. L. No. 103-141, 107 Stat. 1488 (codified as amended at 42 U.S.C. §§ 2000bb to 2000bb-4 (2000)), to respond to the Supreme Court's decision in *Employment Division v. Smith*, 494 U.S. 872 (1990), which had "virtually eliminated the requirement that the government justify burdens on religious exercise imposed by laws neutral toward religion." 42 U.S.C. § 2000bb(a)(4) (2000); *see also City of Boerne v. Flores*, 521 U.S. 507, 512–16 (1997). RFRA sought to re-impose that requirement by providing that the "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability," 42 U.S.C. § 2000bb-1(a), unless the government "demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest," *id.* § 2000bb-1(b). RFRA thus mandates strict scrutiny of any federal law that substantially burdens the exercise of religion, even if the

---

[3] On November 22, 2005, President Bush signed the Science, State, Justice, Commerce, and Related Agencies Appropriations Act, 2006, which appropriated funds for demonstration projects under the JJDPA and included this provision: "[S]ection 702(a) of Public Law 88-352 shall apply to any grants for World Vision, described in House Report No. 108-792 and the statement of managers accompanying this Act, and awarded by the Attorney General." Pub. L. No. 109-108, 119 Stat. 2290, 2303 ("2006 Appropriations Act"). On its face, however, section 702(a) of Public Law 88-352 (codified at 42 U.S.C. § 2000e-1(a) (2000)) exempts religious organizations only from the nondiscrimination provisions of Title VII of the Civil Rights Act of 1964, not from the nondiscrimination provision of the Safe Streets Act. The 2006 Appropriations Act thus does not address whether World Vision is exempt from 42 U.S.C. § 3789d(c).

burden is incidental to the application of a religion-neutral rule. *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 424, 430–31 (2006) ("*O Centro*"). RFRA applies "to all Federal law, and the implementation of that law, whether statutory or otherwise, and whether adopted before or after November 16, 1993." 42 U.S.C. § 2000bb-3(a) (2000).

The White House Office of Faith-Based and Community Initiatives ("OFBCI") takes the position that "an organization's ability to select employees that share its common values and sense of purpose . . . is vital to all organizations, not just faith-based groups." OFBCI, *Protecting the Civil Rights and Religious Liberty of Faith-Based Organizations* at 3 ("*Faith-Based Organizations*") (available at http://georgewbush-whitehouse.archives.gov/government/fbci/religious-hiring-booklet-2005.pdf, last visited Aug. 12, 2014). Because "[a] secular group that receives government money" to administer a federal program "is currently free to hire based on its ideology and mission," OFBCI has stated that "[a]llowing religious groups to consider faith in hiring when they receive government funds simply levels the playing field—by making sure that, when it comes to serving impoverished Americans, faith-based groups are as welcome at the government's table as nonreligious ones." *Id.* OFBCI has accordingly concluded that faith-based groups involved in administering federal social service programs "should retain their fundamental civil rights, including their ability . . . to take their faith into account when they make employment decisions." *Id.*

Accordingly, the President directed in Executive Order 13279 that:

> Consistent with the Free Exercise Clause and the Free Speech Clause of the Constitution, faith-based organizations should be eligible to compete for Federal financial assistance used to support social service programs and to participate fully in the social service programs supported with Federal financial assistance without impairing their independence, autonomy, expression, or religious character. Accordingly, a faith-based organization that applies for or participates in a social service program supported with Federal financial assistance may retain its independence and may continue to carry out its mission, including the definition, development, practice, and expression of its religious beliefs, provided that it does not use direct Federal financial assistance to support any inherently religious activities, such as worship, religious instruction, or proselytization.

*Id.* § 2(f), 3 C.F.R. 258, 260 (2002 Comp.) ("Order"). That executive order illustrates ways in which a faith-based organization may "continue to carry out its mission, including the definition . . . and expression of religious beliefs" while participating in a federally funded social service program:

> Among other things, faith-based organizations that receive Federal financial assistance may use their facilities to provide social services supported with Federal financial assistance, without removing or altering religious art, icons, scriptures, or other symbols from these facilities. In addition, [such] a faith-based organization . . . may retain religious terms in its organization's name, *select its board members on a religious basis*, and include religious references in its organization's mission statements and other chartering or governing documents.

*Id.* (emphasis added).[4] The Order directs that agency heads "implement new policies for their respective agencies that are consistent with and necessary to further the fundamental principles and policymaking criteria articulated in section 2 of this order." *Id.* § 3(b)(ii). In addition, we understand that the President wishes to exempt religious organizations that administer federally funded social services from religious nondiscrimination requirements imposed on their employment practices as a condition of funding, if RFRA is reasonably construed to require such an accommodation. *See* Memorandum for Ralph Boyd, Assistant Attorney General, Civil Rights Division, et al., from Jay Bybee, Assistant Attorney General, Office of Legal Counsel, *Re: Applicability of Religious Freedom Restoration Act to Religious Nondiscrimination Requirements Imposed on Grantees Who Administer Federally Funded Services Under the Substance Abuse and Mental Health Services Act* at 1, 11 (Dec. 2, 2002) ("SAMHSA Memorandum") (discussing application of this intention to SAMHSA grant program); E-mail for John P. Elwood, Deputy Assistant Attorney General, Office of Legal Counsel, from Neomi J. Rao, Associate Counsel to the President (May 10, 2006); *cf. Faith-Based Organizations* at 9 ("President Bush will strive to ensure that faith-based organizations that receive Federal funds retain their civil right to base employment decisions on their ideals and mission.").

To implement Executive Order 13279, the Department of Justice adopted regulations that closely track its language. *See* 28 C.F.R. pt. 38 (2006). The regulations provide that, so long as such groups do not "use direct financial assistance from the Department to support any inherently religious activities, such as worship, religious instruction, or proselytization," a religious organization that participates in the Department-funded programs or services "will retain its independence from Federal, State, and local governments, and may continue to carry out its mission,

---

[4] We understand the four specific instances listed in section 2(f) of the Order to represent *examples* of ways in which a faith-based group could participate in social service programs while "continu[ing] to carry out its mission," rather than to describe the limit of permissible accommodations. The relevant passage begins by noting a specific accommodation that can be made "*[a]mong other things*," and the next sentence discusses three other instances of accommodations that can be made "[i]n addition" to that. Exec. Order No. 13279, § 2(f) (emphasis added). Accordingly, we do not understand the Order to suggest that it forecloses other possible accommodations of religiously-motivated hiring practices.

including the definition, practice, and expression of its religious beliefs." *Id.* § 38.1(c). The regulations then repeat each of the specific examples of permissible religious practices listed in section 2(f) of the Order. *Id.* The regulations note, however, that "[s]ome Department programs . . . contain independent statutory provisions requiring that all grantees agree not to discriminate in employment on the basis of religion." *Id.* § 38.1(f). The regulations therefore recommend that grantees "consult with the appropriate Department program office to determine the scope of any applicable requirements." *Id.*

For the reasons explained below, we conclude that RFRA is reasonably construed to require OJP to exempt World Vision from the Safe Streets Act's religious nondiscrimination provision otherwise applicable to the grant in question, and that, accordingly, OJP would be within its legal discretion, under the JJDPA and under RFRA, to exempt World Vision from the religious nondiscrimination requirements of section 3789d(c)(1). In Part II.A, we explain that the World Vision programs funded by the grant are an "exercise of religion" under RFRA. In Part II.B, we determine that it is reasonable to conclude that requiring World Vision to comply with the nondiscrimination provision as a condition of receiving the grant would "substantially burden" its religious exercise. In Part II.C, we determine that applying a religious nondiscrimination provision to World Vision would not further a compelling governmental interest. Finally, in Part III, we discuss the consistency of our conclusions with relevant decisions of the Supreme Court concerning the government's discretion to fund religious activities.

## A.

RFRA originally provided that "the term 'exercise of religion' means the exercise of religion under the First Amendment to the Constitution." Pub. L. No. 103-141, § 5(4), 107 Stat. at 1489. Many courts initially interpreted RFRA to require that the exercise of religion be "central" to the claimant's religious faith. *See Adkins v. Kaspar*, 393 F.3d 559, 567 n.34 (5th Cir. 2004) (collecting cases). In 2000, however, Congress amended RFRA to incorporate the definition of "exercise of religion" from the newly enacted Religious Land Use and Institutionalized Persons Act ("RLUIPA"). Pub. L. No. 106-274, § 7(a)(3), 114 Stat. 803, 806 (codified at 42 U.S.C. § 2000bb-2(4) (2000)) ("As used in this chapter . . . the term 'exercise of religion' means religious exercise, as defined in section 2000cc-5 of this title."). RLUIPA provides that "[t]he term 'religious exercise' includes any exercise of religion, *whether or not compelled by, or central to, a system of religious belief.*" 42 U.S.C. § 2000cc-5(7)(A) (2000) (emphasis added). Significantly, courts that previously required a showing under RFRA that a burdened

religious practice was fundamental or central to the claimant's faith have repudiat-ed that view since the 2000 amendment.[5]

Under the "broad definition" in RFRA, *Adkins*, 393 F.3d at 567, we conclude that World Vision's work as part of its "Vision Youth" and "Community Mobili-zation Initiative" programs constitutes the "exercise of religion" within the meaning of RFRA. The Supreme Court has long recognized that the "exercise" of religion protected by the First Amendment "involves not only belief and profes-sion but the performance of (or abstention from) physical acts." *Smith*, 494 U.S. at 877; *accord id.* at 893 (O'Connor, J., concurring in the judgment) ("conduct motivated by sincere religious belief" is "at least presumptively protected by the Free Exercise Clause"). The "exercise" of religion encompasses activity "ground-ed in religious belief." *Bob Jones Univ. v. United States*, 461 U.S. 574, 603 (1983) (collecting authorities); *see also Wisconsin v. Yoder*, 406 U.S. 205, 219–20 (1972) (rejecting argument that only belief is protected by Free Exercise Clause). The exercise of religion can include charitable work of the sort involved here. Justice

---

[5] *Compare, e.g., Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 662 (10th Cir. 2006) ("Under the definition of 'religious exercise' . . . , a religious exercise need not be mandatory for it to be protected under RFRA."), *with Werner v. McCotter*, 49 F.3d 1476, 1480 (10th Cir. 1995) ("To exceed the 'substantial burden' threshold, government regulation must significantly inhibit or constrain conduct or expression that manifests some central tenet of a prisoner's individual beliefs . . . or must deny a prisoner reasonable opportunities to engage in those activities that are fundamental to a prisoner's religion.") (superseded by RFRA as recognized in *Grace United Methodist*, 451 F.3d at 662–63); *see also Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 761 (7th Cir. 2003) ("RLUIPA's broader definition of religious exercise, which need not be 'compelled by or central to' a particular religion," must be substituted for circuit's earlier, stricter test); *Adkins*, 393 F.3d at 567 n.34 (noting pre-amendment decisions and amendment); *id.* at 570 (rejecting centrality test, relying on RFRA amendment); *Ford v. McGinnis*, 352 F.3d 582, 593 (2d Cir. 2003) ("declin[ing] to adopt a definition of substantial burden that would require claimants to show that they either have been prevented from doing something their religion says they must, or compelled to do something their religion forbids"); *Peterson v. Minidoka County Sch. Dist. No. 131*, 118 F.3d 1351, 1357 (9th Cir. 1997) ("Francis of Assisi was exercising his religion when he gave his costly clothes to the poor; if a government had tried to prevent the gesture it would have violated his free exercise although he acted from no binding precept.").

While some post-amendment decisions still use language suggesting that religious beliefs must be central to be covered by RFRA (or RLUIPA), those opinions typically do not address the effect of the amendment, but rather uncritically quote decisions that predate the amendment. *See, e.g.*, *Murphy v. Mo. Dep't of Corr.*, 372 F.3d 979, 988 (8th Cir. 2004) ("To constitute a substantial burden [under RLUIPA], the government policy or actions: must 'significantly inhibit or constrain conduct or expression that manifests some central tenet of a [person's] individual [religious] beliefs; . . . or must deny a [person] reasonable opportunities to engage in those activities that are fundamental to a [person's] religion.'") (quoting *Weir v. Nix*, 114 F.3d 817, 820 (8th Cir. 1997)). Indeed, in *Murphy*, the court of appeals did not have to consider whether centrality of belief was necessary, because it accepted, for purposes of summary judgment, the sincerity of the plaintiff inmate's profession that worship with other church members, who could be Caucasian only, was central to his faith. *Id.* at 981, 988. The court of appeals remanded for trial on whether the inmate's beliefs were sincere, on whether the inability to worship communally was a substantial burden on the inmate's faith, and on whether the government had a compelling interest in prison security that justified its refusal to permit the inmate to worship with others of the same faith. *Id.* at 988–89.

Brennan, in his opinion concurring in the judgment in *Corporation of Presiding Bishop v. Amos*, 483 U.S. 327, 340-46 (1987), observed that religious groups "often regard the provision of [community] services as a means of fulfilling religious duty and of providing an example of the way of life [they] seek[] to foster." *Id.* at 344. Justice Brennan opined that persons engaging in nonprofit activities with those purposes were engaged in the "exercise of religion." *Id.* at 343–45. As courts have recognized, charitable work of this sort is an aspect of religious practice in many major world religions. *See, e.g.*, *W. Presbyterian Church v. Bd. of Zoning Adjustment*, 862 F. Supp. 538, 544 (D.D.C. 1994) ("[T]he concept of acts of charity as an essential part of religious worship is a central tenet of all major religions."); *cf. Jesus Ctr. v. Farmington Hills Zoning Bd. of Appeals*, 544 N.W.2d 698, 704 (Mich. App. 1996) ("[P]roviding shelter or sanctuary to the needy[] has been part of the Christian religious tradition since the days of the Roman Empire.").

World Vision's stated purpose for undertaking these two programs is to "love and serve those in need as a demonstration of [its] faith, and the example of Christ." Sept. 8 Letter at 2–3. That purpose is consistent with the organization's general mission statement, which provides that World Vision is a "partnership of Christians whose mission is to follow our Lord and Saviour Jesus Christ in working with the poor and oppressed to promote human transformation, seek justice and bear witness to the good news of the Kingdom of God." World Vision International, Mission Statement (available at http://www.wvi.org/wvi/about_us/who_we_are.htm, last visited June 22, 2007).\* World Vision thus undertakes its charitable work, including the Vision Youth and Community Mobilization Initiative programs, as an expression of its religious beliefs. Even under RFRA's prior definition, the few courts that directly addressed whether such charitable activities were an exercise of religion concluded that they were. *See, e.g.*, *Stuart Circle Parish v. Bd. of Zoning Appeals*, 946 F. Supp. 1225, 1237 (E.D. Va. 1996) (granting preliminary injunction on RFRA and Free Exercise claim because "plaintiffs have given strong evidence that the Meal Ministry [charitable feeding program] is motivated by their religious belief and that their participation in the Meal Ministry constitutes the free exercise of religion"); *W. Presbyterian*, 862 F. Supp. at 546 ("Unquestionably, the Church's feeding program in every respect is religious activity and a form of worship."); *Jesus Ctr.*, 544 N.W.2d at 703–04 (holding that organization's provision of shelter to homeless, which "flows from its religious beliefs," is an "exercise of religion" under RFRA).[6] Under the

---

\* Editor's Note: The mission statement now can be found at http://www.wvi.org/our-mission-statement (last visited Sept. 18, 2014).

[6] During the debates that preceded the amendment to RFRA's definition of religious exercise, a number of members of Congress cited *Western Presbyterian* and similar cases and said that those cases represented the kind of activities the members wished to protect through legislation. *See, e.g.*, 145 Cong. Rec. 16,224 (1999) (statement of Rep. Canady) ("While RFRA was on the books, successful claimants included a Washington, D.C. church whose practice of feeding a hot breakfast to homeless

circumstances, we conclude that the two programs operated by World Vision constitute an "exercise of religion."

Our conclusion that the work conducted under these two programs constitutes the exercise of religion is not affected by the fact that World Vision does not seek to proselytize those whom it serves, or the fact that secular organizations perform similar work. A contrary rule, requiring the "exercise of religion" to include a uniquely religious element (e.g., consumption of sacrament, liturgical expression, evangelization of non-believers) would effectively limit the term to practices deemed central to religious belief or observance. As noted above, Congress explicitly rejected a centrality requirement when it amended RFRA in 2000.

## B.

We next address whether requiring World Vision to comply with the Safe Streets Act's religious nondiscrimination provision as a condition of receiving the OJP grant would "substantially burden" the exercise of religion by World Vision. We conclude that RFRA is reasonably construed to provide that placing such a condition on receipt of a grant would substantially burden World Vision's religious exercise.

## 1.

RFRA does not define the term "substantial[] burden." Because "RFRA expressly adopted the compelling interest test 'as set forth in *Sherbert v. Verner*, 374 U.S. 398 (1963)[,] and *Wisconsin v. Yoder*, 406 U.S. 205 (1972),'" *O Centro*, 546 U.S. at 420 (quoting 42 U.S.C. § 2000bb(b)(1)), however, it is widely accepted that the Court's pre-*Smith* decisions provide guidance in determining the meaning of that term. *See, e.g.*, *Goodall v. Stafford County Sch. Bd.*, 60 F.3d 168, 171 (4th Cir. 1995). Those decisions indicate that directly prohibiting a religious organization from hiring only persons of the same faith could impose a "substantial burden" on the exercise of religion by the organization.

The Supreme Court's opinion in *Corporation of Presiding Bishop v. Amos* is instructive. The Court there rejected an Establishment Clause challenge to a provision of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-1(a), which exempted religious organizations from the Title VII prohibition on religious discrimination and permitted religious organizations to consider religion in hiring for all of their activities. A former employee at a gymnasium operated by the Church of Jesus Christ of Latter-Day Saints had been terminated after he failed to

---

men and women reportedly violated zoning laws"; "[t]he same sorts of cases would be affected by this legislation."); *id*. at 16,226 (statement of Rep. Hutchinson) ("It is necessary to make sure that a small church is able to continue its ministry to the homeless."); *id*. at 16,241 (statement of Rep. Bachus) ("[W]e will not prohibit a church here in Washington, D.C., to feed the homeless").

provide a certificate indicating that he was a member of the Church. The Church cited the Title VII exemption in responding to his suit for religious discrimination; the employee argued that exempting the religious organization violated the Establishment Clause. The Court explained that the exemption served a valid secular purpose because it "alleviate[d] significant governmental interference with the ability of religious organizations to define and carry out their religious missions." *Amos*, 483 U.S. at 335.

The Court did not take issue with the trial court's determination that running the gymnasium was a "nonreligious activity," *id.* at 332, but nevertheless upheld the Title VII exemption even as applied to the nonreligious activities of a religious organization. *Id.* at 335–36. The Court reasoned that the line between secular and religious activities "is hardly a bright one" and that it would significantly burden a religious group "to require it, on pain of substantial liability, to predict which of its activities a secular court will consider religious." *Id.* at 336. "Fear of potential liability might affect the way an organization carried out what it understood to be its religious mission." *Id.* The Court thus deemed it permissible for Congress to exempt the activities of religious organizations from the religious nondiscrimination requirements of Title VII.[7]

This Office previously has concluded that the Court's opinion in *Amos*, together with Justice Brennan's concurring opinion in the case, indicates that prohibiting religious organizations from hiring only coreligionists can "impose a significant burden on their exercise of religion, even as applied to employees in programs that must, by law, refrain from specifically religious activities." *Direct Aid to Faith-Based Organizations Under the Charitable Choice Provisions of the Community Solutions Act of 2001*, 25 Op. O.L.C. 129, 132 (2001). We explained further:

> Many religious organizations and associations engage in extensive social welfare and charitable activities, such as operating soup kitchens and day care centers or providing aid to the poor and the homeless. Even where the content of such activities is secular—in the sense that it does not include religious teaching, proselytizing, prayer or ritual—the religious organization's performance of such functions is likely to be "infused with a religious purpose." *Amos*, 483 U.S. at

---

[7] While we do not resolve the issue, an argument could be made that not permitting a religious organization to discriminate on the basis of religion in hiring, while permitting non-religious organizations to discriminate on the basis of their particular ideologies in hiring, would violate the Free Exercise Clause and the Free Speech Clause. *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 542 (1993) (city ordinances forbidding "ritual" killing of animals violated Free Exercise Clause, because they "were gerrymandered with care to proscribe religious killings of animals but to exclude almost all secular killings"); *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 830–37 (1995) (university's policy of reimbursing publication expenses incurred by student organizations, unless organizations engaged in religious activity, constituted viewpoint discrimination in violation of Free Speech Clause).

> 342 (Brennan, J., concurring). And churches and other religious enti-
> ties "often regard the provision of such services as a means of ful-
> filling religious duty and of providing an example of the way of life
> a church seeks to foster." *Id.* at 344 (footnote omitted). In other
> words, the provision of "secular" social services and charitable
> works that do not involve "explicitly religious content" and are not
> "designed to inculcate the views of a particular religious faith,"
> *Bowen v. Kendrick*, 487 U.S. 589, 621 (1988), nevertheless may well
> be "religiously inspired," *id.*, and play an important part in the "fur-
> therance of an organization's religious mission." *Amos*, 483 U.S. at
> 342 (Brennan, J., concurring).

*Id.* at 132–33. We thus concluded that "the selection of coreligionists in particular social-service programs will ordinarily advance a religious organization's religious mission, facilitate the religiously motivated calling and conduct of the individuals who are the constituents of that organization, and fortify the organization's religious tradition." *Id.* at 133. "Where an organization makes such a showing, the title VII prohibition on religious discrimination would impose 'significant governmental interference' with the ability of that organization 'to define and carry out [its] religious mission[],' *Amos*, 483 U.S. at 335, even as applied to employees who are engaged in work that is secular in content." *Id.*[8]

Another agency of the Executive Branch, the Department of Health and Human Services ("HHS"), also has concluded that imposing a religious nondiscrimination requirement on religious organizations under some circumstances can "substantially burden" the exercise of religion within the meaning of RFRA. The Substance Abuse and Mental Health Services Administration ("SAMHSA"), in promulgating regulations governing the disbursement of federal grants to private entities for treatment of substance abuse, has stated:

> [W]here a religious entity establishes that its exercise of religion
> would be substantially burdened by the [applicable] religious non-
> discrimination provisions . . . , RFRA super[s]edes those statutory
> requirements, thus exempting the religious entity therefrom, unless

---

[8] *See also* Memorandum for William P. Marshall, Deputy Counsel to the President, from Randolph D. Moss, Assistant Attorney General, Office of Legal Counsel, *Re: Application of the Coreligionists Exemption in Title VII of the Civil Rights Act of 1964* at 29–30 (Oct. 12, 2000) ("*Coreligionists Exemption*") (exempting a religious organization from a nondiscrimination provision "might be a permissible religious accommodation" where the organization's "preference for coreligionist employees in particular social-service programs . . . advance[s] [the] organization's religious mission"). *Cf. NLRB v. Catholic Bishop of Chi.*, 440 U.S. 490, 502 (1979) (construing NLRB jurisdiction not to extend to teachers in church-operated schools, in part because inquiry into and resolution of unfair labor practice charges "may impinge on rights guaranteed by the Religion Clauses"); *EEOC v. Catholic Univ. of Am.*, 83 F.3d 455, 467–70 (D.C. Cir. 1996) (applying nondiscrimination provision in Title VII to a religious university's canon law faculty is a "substantial burden" under RFRA).

the Department has a compelling interest in enforcing them. . . . Many . . . religious organizations . . . consider religious faith critical to all of their employees' activities, including those that involve providing government-funded social services to the public. For these groups, imposition of a religious nondiscrimination requirement can impose a particularly harsh burden. . . . For groups that deem religious faith an important part of their self-definition, having to make employment decisions without regard to their faith would substantially alter the charter of their organization.

*Charitable Choice Regulations Applicable to States Receiving Substance Abuse Prevention and Treatment Block Grants*, 68 Fed. Reg. 56,430, 56,435 (Sept. 30, 2003). SAMHSA therefore will exempt a charitable group from religious nondiscrimination requirements if (as relevant here) the group certifies "that it sincerely believes that employing individuals of a particular religion is important to the definition and maintenance of their religious identity, autonomy, and/or communal religious exercise"; "that it makes employment decisions on a religious basis in analogous programs" not supported by the grant; and "that providing the services in question is expressive of its values or mission." 42 C.F.R. § 54.6(b) (2005). Before the SAMSHA regulations were issued, this Office concluded that it was "reasonable to read RFRA to permit the Secretary of HHS to exempt certain religious organizations from prohibitions on religious discrimination in employment, even in the context of a federally funded program." SAMHSA Memorandum at 11.[9]

## 2.

Here, of course, if the Safe Streets Act's religious nondiscrimination requirement were enforced with respect to the World Vision grants, the government would not be directly restricting World Vision's hiring. Rather, it would be conditioning the receipt of a nearly $1.5 million grant on World Vision's willingness to hire people who do not share the organization's religious convictions. The fact that a law "does not *compel* a violation of conscience," however, "is only the

---

[9] The legislative history of RLUIPA suggests that Congress wished to protect religious preferences in hiring. During the debates preceding enactment of RLUIPA, a number of members of Congress spoke of the importance of protecting the ability of religious groups to take religion into account in hiring. *See, e.g.*, 145 Cong. Rec. 16,224 (1999) (statement of Rep. Canady) ("While RFRA was on the books, successful claimants included . . . a religious school resisting a requirement that it hire a teacher of a different religion"; "the same sorts of cases would be affected by this legislation."); *id.* at 16,218–19 (statement of Rep. Blunt) ("This is clearly an area that needs protection. It is an area where local governments constantly in recent years have fought in the face of what we consider to be First Amendment rights. . . . In Philadelphia, Pennsylvania, Christian day care centers were threatened with closure if they did not change their hiring practices which barred them from hiring non-Christians . . . . [T]hese infringements on religious liberty are significant.").

beginning, not the end, of our inquiry." *Thomas v. Review Bd.*, 450 U.S. 707, 717 (1981) (quoting *Sherbert*, 374 U.S. at 403–04) (emphasis in original). The Supreme Court "has repeatedly held that indirect coercion or penalties on the free exercise of religion, not just outright prohibition, are subject to scrutiny under the First Amendment." *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 450 (1988). Indeed, the Court made clear, in the line of cases that RFRA explicitly adopted, that "[i]t is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions on a benefit or privilege." *Sherbert*, 374 U.S. at 404. Where a condition placed on the availability of benefits "forces [a person] to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to [qualify for benefits], on the other hand," the government has "put[] the same kind of burden upon the free exercise of religion as would a fine imposed against appellant for her [exercise of religion]." *Id.* Thus, in *Sherbert*, the Supreme Court held that a state government violated the Free Exercise Clause by conditioning unemployment compensation benefits on an applicant's willingness to be available for work on Saturday, in violation of the applicant's religious beliefs about observing the Sabbath. *Id.* at 403–10; *see also Frazee v. Ill. Dep't of Empl. Sec.*, 489 U.S. 829, 832–35 (1989) (same); *Hobbie v. Unemployment Appeals Comm'n*, 480 U.S. 136, 141 (1987) (same). And in *Thomas*, the Court held that a state government violated the Free Exercise Clause by denying unemployment benefits to a Jehovah's Witness who had quit his job at a foundry that made tank turrets, because his religious beliefs prevented him from participating in the production of weapons. 450 U.S. at 709–12, 717–19.

Although *Sherbert* and its progeny involved conditions placed on individuals' exercise of religion, we do not understand that line of cases to apply only to individuals. The Supreme Court has entertained numerous Free Exercise Clause challenges brought by institutions stemming from the denial of benefits or tax exemptions. It has never suggested that institutions may not maintain such a claim. *See, e.g.*, *Jimmy Swaggart Ministries v. Bd. of Equalization*, 493 U.S. 378, 384–92 (1990) (considering but rejecting religious corporation's free exercise claim); *Lyng*, 485 U.S. at 447–53 (considering but rejecting tribal association's free exercise claim); *Bob Jones Univ.*, 461 U.S. at 602–04 (considering but rejecting university's free exercise claim). To the contrary, it has suggested that the denial of tax benefits to religious organizations can constitute a substantial burden. *Bob Jones Univ.*, 461 U.S. at 603–04 (acknowledging that "[d]enial of tax benefits will inevitably have a substantial impact on the operation of private religious schools," but upholding denial of tax advantage because of "compelling" government interest in "eradicating racial discrimination in education").

Even if *Sherbert* and its progeny are properly read to apply only to individuals, Congress seems to have intended that the *Sherbert* standard would apply to

institutions as well as to individuals under RFRA.[10] Thus, this Office previously has advised that "the loss of [discretionary] grants may constitute a substantial burden on religion, provided that the grant would materially affect the grantee's ability to provide the type of services in question and providing those services is part of the grantee's mission." SAMHSA Memorandum at 7. And the 2003 HHS regulations promulgated to govern the SAMHSA program provide that "religious organizations" are eligible under RFRA for relief from religious nondiscrimination requirements in employment statutes. 68 Fed. Reg. at 56,435; 42 C.F.R. § 54.6(b).

*Thomas* is perhaps the leading Supreme Court exposition of the standard for determining when a condition on public benefits constitutes a substantial burden on the exercise of religion. It states:

> Where the state conditions receipt of an *important benefit* upon conduct mandated by religious belief, or where it denies such a benefit because of conduct mandated by religious belief, thereby putting *substantial pressure* on an adherent to modify his behavior and to violate his beliefs, a burden upon religion exists. While the compulsion may be indirect, the infringement upon free exercise is nonetheless substantial.

450 U.S. at 717–18 (emphases added).[11] Thus, *Thomas* provides that the conditioning of a benefit can constitute a substantial burden only if the benefit is an "important" one; its availability is conditioned upon performance of conduct "proscribed by a religious faith," or refraining from "conduct mandated by religious belief"; and the result is to put "substantial pressure on an adherent to modify his behavior and violate his beliefs." *Id.* We discuss each of these issues in turn.

---

[10] RFRA provides that the "Government shall not substantially burden a *person*'s exercise of religion . . . ." 42 U.S.C. § 2000bb-1(a) (emphasis added). Although RFRA does not define the term "person," Congress has made clear that the term ordinarily includes nonprofit corporations such as World Vision. *See* 1 U.S.C. § 1 (2000) ("In determining the meaning of any Act of Congress, unless the context indicates otherwise . . . the word[] 'person' . . . include[s] corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals."); *Wilson v. Omaha Indian Tribe*, 442 U.S. 653, 666 (1979) (the word "person" in 1 U.S.C. § 1 is "normally construed" to include associations and artificial persons). Consistent with that understanding, numerous courts have applied RFRA to claims brought by corporations, *see, e.g.*, *Daytona Rescue Mission, Inc. v. City of Daytona Beach*, 885 F. Supp. 1554 (M.D. Fla. 1995); churches and religious groups, *see, e.g.*, *O Centro*, 546 U.S. 418; *W. Presbyterian*, 862 F. Supp. 538; and universities, *see, e.g.*, *Catholic Univ.*, 83 F.3d 455.

[11] *See also Hobbie*, 480 U.S. at 141; *United States v. Lee*, 455 U.S. 252, 257 (1982) (concluding that obligation to pay social security taxes substantially burdened exercise of religion by Amish); *Yoder*, 406 U.S. at 218 (concluding that misdemeanor statute compelling school attendance substantially burdened exercise of religion by Amish); *cf. Lyng*, 485 U.S. at 450 (suggesting that "indirect coercion or penalties" with "tendency to coerce individuals into acting contrary to their religious beliefs" may constitute substantial burden on exercise of religion). *See generally Religious Objections to the Postal Service Oath of Office*, 29 Op. O.L.C. 37, 50–51 (2005) (discussing *Thomas* standard).

**a.**

The precise scope of the term "important benefit" is not clear. *Thomas* suggests that the benefit should be important enough to put "substantial pressure" on the recipient to change its behavior so as not to lose the benefit. From that suggestion we deduce that "importance" should be assessed not in the abstract but rather functionally, by considering the substantiality of the pressure that placing conditions on receipt of a benefit would exert on a particular party "to modify his behavior and to violate his beliefs." *Thomas*, 450 U.S. at 718; *see also Guam v. Guerrero*, 290 F.3d 1210, 1222 (9th Cir. 2004) (RFRA) (applying *Thomas* test); *Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996) (same); *cf. Lyng*, 485 U.S. at 451 (explaining that to trigger strict scrutiny under pre-*Smith* interpretation of Free Exercise Clause, governmental burden must have "tendency to coerce individuals into acting contrary to their religious beliefs").

The term "substantial"—which is the same modifier used in the statutory "substantial burden" test itself—indicates that the pressure must be "material" or "considerable in amount, value, or worth." *Webster's Third New International Dictionary* 2280 (2002). At the same time, the pressure need not be overwhelming. *Id.* ("being that specified to a large degree or in the main"); 17 *Oxford English Dictionary* 67 (2d ed. 1989) ("Of ample or considerable amount, quantity, or dimensions. More recently also in a somewhat weakened sense, esp. 'fairly large.'"). Consistent with that meaning, the courts have interpreted the standard to require more than de minimis pressure—usually "significant pressure" to modify religious behavior, and "more than an inconvenience on religious exercise." *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1227 (11th Cir. 2004) (RLUIPA); *Adkins*, 393 F.3d at 570 (RLUIPA) ("a government action or regulation creates a 'substantial burden' on a religious exercise if it truly pressures the adherent to significantly modify his religious behavior and significantly violate his religious beliefs"; "the effect of a government action or regulation is significant when it either (1) influences the adherent to act in a way that violates his religious beliefs, or (2) forces the adherent to choose between, on the one hand, enjoying some generally available, non-trivial benefit, and, on the other hand, following his religious beliefs"); *San Jose Christian Coll. v. City of Morgan Hill*, 360 F.3d 1024, 1034 (9th Cir. 2004) (RLUIPA) ("[A] 'substantial burden' on 'religious exercise' must impose a significantly great restriction or onus upon such exercise."); *Guerrero*, 290 F.3d at 1222 (RFRA) ("A substantial burden must be more than an 'inconvenience.'") (quoting *Worldwide Church of God v. Phila. Church of God, Inc.*, 227 F.3d 1110, 1121 (9th Cir. 2000); *cf. Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 197 (2002) ("The word 'substantial' [in the Americans with Disabilities Act] thus clearly precludes impairments that interfere in only a minor way . . . ."); *Levitan v. Ashcroft*, 281 F.3d 1313, 1320–21 (D.C. Cir. 2002) ("substantial burden" test involves "substantial, as opposed to inconsequential burden[s] on the litigant's religious practice"); *see also* H.R. Rep. No. 106-219, at

13 (1999) (Congress "intended to ensure that strict scrutiny is not triggered by trivial, technical, or *de minim[i]s* burdens on religious exercise").[12]

We are not aware of any judicial decisions applying RFRA to discretionary grants of the sort at issue here, but the standard enunciated in *Thomas* appears to be sufficiently broad to bear an interpretation that would include such grants. The benefit at issue undoubtedly is important to World Vision. For the relevant fiscal year, the nearly $1.5 million grant represents approximately 10% of the entire budget for World Vision's domestic community-based programs, and approximately 75% of the public funding the organization received domestically. Sept. 23 Letter at 2. World Vision has stated that if it does not receive the grant, its work on the Vision Youth project will be "drastically reduced." Sept. 8 Letter at 3. Losing the grant "would have an indirect [e]ffect on training at all Vision Youth sites," and would mean that the "national and site Educational consultants . . . and the pilot project for the sites would no longer be funded." *Id.* "Program quality and training nationally would be in jeopardy." *Id.* Moreover, the second component of the grant, the new anti-gang initiative, "would be next to impossible to undertake, given the need to hire all new staff for this brand new program." *Id.*

The denial of a grant to an institution such as World Vision may not be as important as the denial of unemployment compensation to an individual as in *Sherbert* or *Thomas*. Unemployment compensation may well have been critical for the claimants in *Sherbert* and *Thomas* to maintain their household income. But the Supreme Court's pre-*Smith* case law acknowledged that losing benefits not critical to subsistence (such as the tax exemption at issue in *Bob Jones*) can also impose a substantial burden. In *Sherbert*, the Supreme Court acknowledged that "of the approximately 150 or more Seventh-day Adventists in the Spartanburg area, only appellant and one other have been unable to find suitable non-Saturday employment." 374 U.S. at 399 n.2. Despite the possibility that she would eventually find suitable work, the Court found the denial of unemployment compensation important enough to the appellant to constitute a substantial burden. *Cf. United States v. Lee*, 455 U.S. 252, 257 (1982) (payment of social security taxes, which could later be recouped as benefits, was nevertheless substantial burden on exercise of religion by Amish, given their belief "in a religiously based obligation to provide for their fellow members the kind of assistance contemplated by the social security system"). Indeed, the pre-*Smith* cases suggest that a substantial burden may arise when a person is denied the opportunity to partake of a public benefit on the same terms as others because of his religious activity. *See Lyng*, 485 U.S. at 449 (suggesting that "governmental action penaliz[ing] religious activity by denying any person an equal share of the rights, benefits, and privileges enjoyed by other citizens" would constitute substantial burden); *see also Adkins*,

---

[12] Because the operative provisions of the two statutes are identical, courts applying RLUIPA and RFRA regularly look to decisions involving the other statute for guidance. *See, e.g.*, *Cutter v. Wilkinson*, 544 U.S. 709, 723 n.11 (2005); *Grace United Methodist*, 451 F.3d at 661.

393 F.3d at 570 (RLUIPA) ("[T]he effect of a government action or regulation is significant when it . . . forces the adherent to choose between, on the one hand, enjoying some generally available, non-trivial benefit, and, on the other hand, following his religious beliefs."). As noted, this Office previously has advised that "the loss of [discretionary] grants may constitute a substantial burden on religion, provided that the grant would materially affect the grantee's ability to provide the type of services in question and providing those services is part of the grantee's mission." SAMHSA Memorandum at 7. And the regulations that HHS promulgated in 2003 governing the SAMHSA program embody the understanding that the loss of such discretionary grants may constitute a substantial burden on religion. 68 Fed. Reg. at 56,435; 42 C.F.R. § 54.6(b) ("To the extent that 42 U.S.C. 300x-57(a)(2) or 42 U.S.C. 290cc-33(a)(2) precludes a program participant from employing individuals of a particular religion to perform work connected with the carrying on of its activities, those provisions do not apply if such program participant is a religious corporation, association, educational institution, or society and can demonstrate that its religious exercise would be substantially burdened by application of these religious nondiscrimination requirements to its employment practices in the program or activity at issue."). That understanding is consistent with the legislative history of RFRA, which indicates that some members of Congress understood that the statute would apply to the denial of funding as well as conditions on other sorts of benefits.[13]

### b.

There is language in *Thomas* suggesting that a condition substantially burdens the exercise of religion only if it requires conduct "proscribed by a religious faith" or abstention from conduct "mandated by religious belief." 450 U.S. at 717-18. Both under *Sherbert* and under RFRA before the 2000 amendment, courts considered whether a practice was absolutely mandated or prohibited by the claimant's religious faith as a factor in favor of a determination that a condition imposed a substantial burden, *see, e.g.*, *Thomas*, 450 U.S. at 711 (Jehovah's Witness's beliefs forbade participation in production of armaments); *Hobbie*, 480 U.S. at 138 (Seventh Day Adventists' beliefs forbade work from sundown on Friday to sundown on Saturday), and courts also seem to have given weight to whether the practice was strongly encouraged or discouraged by the claimant's religious faith, *see, e.g.*, *In re Young*, 82 F.3d 1407 (8th Cir. 1996) (because debtor's beliefs encouraged tithing, bankruptcy trustee could not treat resulting

---

[13] The Senate Report, for example, states that "the denial of such funding, benefits or exemptions may constitute a violation of the act, as was the case under the free exercise clause in *Sherbert v. Verner*." S. Rep. No. 103-111, at 15 (1993), *reprinted in* 1993 U.S.C.C.A.N. 1892, 1905.

tithes as voidable transfers under RFRA)[14]; *In re Hodge*, 220 B.R. 386 (D. Idaho 1998) (same).

We have already observed, however, that Congress amended RFRA in 2000 to make clear that it protected "any exercise of religion, whether or not *compelled* by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A) (emphasis added). It would be anomalous for Congress to declare that the "exercise of religion" includes practices neither central to nor mandated by religious faith, but then to impose a rule that a burden on such practices could never be "substantial" under RFRA. We therefore conclude that it is not necessary to show that a person was required to violate a fundamental tenet of his religion to make a "substantial burden" claim under RFRA. Perhaps because of the requirement that a burden be "substantial," however, many courts apparently continue to require a showing that the practice burdened at least be "important" to the party's exercise of religion. *See, e.g.*, *Adkins*, 393 F.3d at 570 ("[T]he Supreme Court's express disapproval of any test that would require a court to divine the centrality of a religious belief does not relieve a complaining adherent of the burden of demonstrating the honesty and accuracy of his contention that the religious practice at issue is important to the free exercise of his religion.") (footnote omitted); *Henderson v. Kennedy*, 265 F.3d 1072, 1074 (D.C. Cir. 2001) ("Although the amendments extended the protections of RFRA to 'any exercise of religion, whether or not compelled by, or central to, a system of religious belief,' the amendments did not alter the propriety of inquiring into the importance of a religious practice when assessing whether a substantial burden exists.") (citation omitted).

In this case, World Vision has not claimed that its members are compelled by religious conscience to associate only with people who share their faith, in the sense that they would consider hiring non-Christians to be a sin. But World Vision professes a consistent history of hiring coreligionists, which lends credence to its stated belief, *see supra* note 2, that the organization "can only remain true to [its] vision if [it] ha[s] the freedom to select like-minded staff, which includes staffing on a religious basis." Sept. 23 Letter at 1; *see also* Sept. 8 Letter at 2–3 (stating that hiring staff members who profess similar Christian beliefs is essential for World Vision to remain true to its religious "mission" and "identity"); World Vision International, Mission Statement, available at http://www.wvi.org/wvi/about_us/who_we_are.htm (last visited June 22, 2007) (describing organization as a "partner-

---

[14] The panel decision in *Young* was vacated by the Supreme Court, *Christians v. Crystal Evangelical Free Church*, 521 U.S. 1114 (1997), for reconsideration in light of *City of Boerne v. Flores*, 521 U.S. 507 (1997), which held that the application of RFRA to state and local laws exceeded Congress's enforcement power under the Fourteenth Amendment. On remand, the Eighth Circuit concluded that RFRA remained applicable to the federal bankruptcy code and reinstated the original panel decision that the bankruptcy trustee could not treat the debtors' tithe as a voidable transfer because of RFRA. *In re Young*, 141 F.3d 854 (8th Cir. 1998).

ship of Christians").[*] Hiring persons who do not share the organization's religious beliefs would, according to World Vision's view of the program, dilute the organization's conception of undertaking these programs to "love and serve those in need as a demonstration of [its] faith, and the example of Christ." Sept. 8 Letter at 2–3. In addition, it is apparent that performing service work is an important aspect of World Vision's exercise of religion, *see supra* note 6 and accompanying text, heeding the Christian "call to share resources with each other" and the "call to servanthood," World Vision International, Core Values (available at http://www.wvi.org/wvi/about_us/who_we_are.htm, last visited June 22, 2007)[**]; *cf.* Grant Application, att. 2, Program Narrative at 10 (stating that World Vision is "dedicated to helping children and their communities worldwide reach their full potential"). Thus, to comply with the condition would require World Vision to retreat from an important religious precept by abandoning the explicitly religious manner in which the organization has chosen to define itself.

## c.

In light of these principles, we think that it would be reasonable for OJP to conclude that requiring World Vision to comply with the Safe Streets Act's nondiscrimination provision as a condition of accepting the approximately $1.5 million grant would "put[] substantial pressure on . . . [World Vision] to modify [its] behavior and to violate [its] beliefs,'" by compromising its religious identity. *Thomas*, 450 U.S. at 718. (Indeed, that reading seems at least as reasonable as construing RFRA *not* to require an accommodation under these circumstances.) Application of the provision would practically require World Vision either to forgo substantial federal funding altogether or to compromise its religious identity by abandoning its long-held view that its religious "mission" and "identity" require it to staff the organization with coreligionists. Sept. 8 Letter at 2–3. Of course, the nondiscrimination provision prohibits World Vision from making hiring decisions based on religion only "in connection with any programs or activity funded in whole or in part with [the grant]." 42 U.S.C. § 3789d(c)(1). But World Vision's current managers, who were (and presumably will continue to be) hired under its current employment policy, will supervise the Vision Youth and anti-gang programs, and a portion of their salaries would thus be traceable to federal funds. *See* Grant Application, att. 1, Consolidated Budget Worksheet at 1 (stating that existing managers would spend between 8.1% and 80% of their annual work hours on these projects). World Vision represents that the programs that are the subject of the grants are "very staff intensive and require[] the

---

[*] Editor's Note: The mission statement now can be found at http://www.wvi.org/our-mission-statement (last visited Sept. 18, 2014).

[**] Editor's Note: The statement of core values now can be found at http://www.wvi.org/our-core-values (last visited Sept. 18, 2014).

programmatic expertise, training and oversight" of existing World Vision employees, Sept. 23 Letter at 2, and that "[i]t is not possible for us to effectively conduct these activities without such essential human resources." *Id.*

As described in Part II.B.2.a, the benefit provided by the JJDPA grant is very important to the organization. Without it, the Vision Youth program or would have to be "drastically reduced," and it would be "next to impossible" to undertake the new anti-gang initiative. Because the grant is clearly critical to the organization's ongoing operations, we conclude, consistent with HHS's SAMHSA regulations and this Office's previous views on those regulations, that it is reasonable to conclude that conditioning the grant on the discontinuation of religion-based hiring would place significant pressure on the organization to abandon its religious character. We therefore believe it is reasonable to conclude that conditioning the World Vision grant on compliance with the Safe Streets Act's religious nondiscrimination provision would constitute a substantial burden on religious exercise under *Thomas*. *See* 42 C.F.R. § 54.6(b) (requiring charitable group that seeks exemption under SAMHSA regulations from religious hiring restrictions to certify, among other things, "that the grant would materially affect its ability to provide the type of services in question"); SAMHSA Memorandum at 7 ("[I]f a religious organization is otherwise best qualified to receive a $100,000 grant, and its faith-based hiring practice is the sole reason that it may not receive the grant, the pressure to revise that hiring practice[] to receive aid is quite significant."); *cf. Children's Healthcare Is a Legal Duty, Inc. v. Min de Parle*, 212 F.3d 1084, 1093 (8th Cir. 2000) (concluding that requiring people to choose "between adhering to their religious beliefs and foregoing all government health care benefits, or violating their religious convictions and receiving the medical care provided by Medicare and Medicaid," created "especially acute" pressure "similar to that contemplated by the *Sherbert* line of cases"; providing non-medical benefits for such adherents as an accommodation thus served a valid secular purpose and did not violate the Establishment Clause); *Jesus Ctr.*, 544 N.W.2d at 704–05 (holding that zoning board's denial of permission to operate shelter in church was substantial burden where, although other locations for operation were available, relocating shelter would be costly and would detract from mission of church to combine worship and social services).

Some courts have suggested that placing conditions on the exercise of religion can constitute a "substantial burden" only with respect to widely available benefits—perhaps because a benefit's wide availability suggests the government has deemed it to be important, or because a widely available benefit is more likely to induce reliance and thereby increase the pressure that its conditional availability could place upon a RFRA claimant. *Cf. Adkins*, 393 F.3d at 570 (RLUIPA) (stating that conditioning "some generally available, non-trivial benefit" on failing to "follow[] [one's] religious beliefs" would constitute a substantial burden). *But see Lyng*, 485 U.S. at 449 (suggesting that "governmental action penaliz[ing] religious activity by denying any person an equal share of the rights, benefits, and

privileges enjoyed by other citizens" would constitute substantial burden). We need not determine the relevance of that consideration, because even if a benefit's wide availability is a predicate for finding that conditions on it constitute a "substantial burden," the benefit in this case would satisfy that test. While in absolute terms the JJDPA grant program may not be as "widely available" as the unemployment compensation in *Sherbert* and *Thomas*, it is still broadly available to the universe of potential grantees. As noted above, in the 2005 Appropriations Act, Congress appropriated slightly more than $100 million for OJP to disburse for anti-juvenile delinquency programs under sections 261 and 262 of the JJDPA. Section 261 of the JJDPA makes this funding broadly available to any public or private entity, individual or corporate, that wishes to administer an anti-juvenile delinquency program:

> The Administrator may make grants to and contracts with States, units of general local government, Indian tribal governments, public and private agencies, organizations, and individuals, or combinations thereof, to carry out projects for the development, testing, and demonstration of promising initiatives and programs for the prevention, control, or reduction of juvenile delinquency.

42 U.S.C. § 5665(a) (Supp. III 2003). Section 261 further directs OJP to ensure that the grant money is distributed widely to all areas of the country. *Id.* ("The Administrator shall ensure that, to the extent reasonable and practicable, such grants are made to achieve an equitable geographical distribution of such projects throughout the United States."). It would not be reasonable to characterize the benefit in this case as too narrow to warrant protection under RFRA.

Moreover, because the conference report specifically identified World Vision and said that "OJP [wa]s expected to review" the organization's proposal and "provide [a] grant[] if warranted," H.R. Rep. No. 108-792, at 769, it appears that World Vision was more likely than another potential grantee, not specifically identified in the conference report, to receive a grant. Under the circumstances, the benefit that World Vision risks losing is arguably more analogous to a general entitlement than to a discretionary grant whose availability is limited and speculative. We therefore conclude that, under the circumstances, the benefit is broadly enough available that placing conditions on its availability could exert "substantial pressure" on an organization in the position of World Vision. Other more narrowly available benefits may not exert sufficient pressure on a RFRA claimant to qualify as a "substantial burden" on the exercise of religion.

## C.

If the application of restrictions on religious hiring constitutes a substantial burden on World Vision's religious exercise, the next step in the analysis is to

determine whether the government has a compelling interest in requiring World Vision not to discriminate on a religious basis in hiring. 42 U.S.C. § 2000bb-1(b); *see generally O Centro*, 546 U.S. at 424–32. The burden to show a compelling interest is on the government, *O Centro*, 546 U.S. at 428–30, and to meet its burden the government must do more than cite its general interest in preventing religious discrimination, *id.* at 431–33 (general interest in preventing drug abuse not enough to justify denial of exemption from Controlled Substances Act for sacramental consumption of hoasca). "RFRA requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened." *Id.* at 430–31 (citing 42 U.S.C. § 2000bb-1(b)). Given that many statutes exempt religious organizations from prohibitions on religious discrimination in employment, we conclude that applying the Safe Streets Act's nondiscrimination provision to World Vision in this instance would not further a compelling governmental interest. Accordingly, we do not address whether the nondiscrimination requirement is the "least restrictive means" of furthering such an interest under 42 U.S.C. § 2000bb-1(b)(2). *Compare Braunfeld v. Brown*, 366 U.S. 599, 607–08 (1961) (plurality opinion) (concluding that Sunday closing law that required merchants to choose between losing sales or remaining open on Saturday did not violate Free Exercise Clause because State had compelling interest in mandating single day of rest); *id.* at 610 (Frankfurter, J., concurring in the judgment) (incorporating by reference opinion in *McGowan v. Maryland*, 366 U.S. 420, 521 (1961) ("[T]he burden which Sunday statutes impose is an incident of the only feasible means to achievement of their particular goal.")).

The recognition that religious discrimination in employment is permissible in some circumstances suggests that there are contexts in which the government does not have a compelling interest in enforcing prohibitions on such conduct. *See O Centro*, 546 U.S. at 433 (holding that, in light of Controlled Substance Act's statutory exception for sacramental use of peyote despite its classification as dangerous drug, "it is difficult to see" how congressional findings of dangerousness of drug hoasca can support showing of compelling interest and "preclude any consideration of a similar exception" for that drug); *Church of the Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 547 (1993) ("It is established in our strict scrutiny jurisprudence that 'a law cannot be regarded as protecting an interest "of the highest order" . . . when it leaves appreciable damage to that supposedly vital interest unprohibited . . . .'") (quoting *Fla. Star v. B.J.F.*, 491 U.S. 524, 541–42 (1989) (Scalia, J., concurring in part and concurring in the judgment) (ellipsis in original)); *Fla. Star*, 491 U.S. at 540 ("[T]he facial underinclusiveness of [the statute] raises serious doubts about whether Florida is, in fact, serving, with this statute, the significant interests which appellee invokes in support of affirmance."). Congress has created numerous exceptions to prohibitions on religious discrimination in employment. Religious entities are already exempt from the religious nondiscrimination requirements of the Civil Rights Act of 1964, 42 U.S.C.

§ 2000e-1(a) (2000). That exemption "reflects Congress's judgment that employment decisions are an important component of religious organizations' autonomy, and that the government has a much stronger interest in applying a religious nondiscrimination requirement to secular organizations than to religious organizations[,] many of whose existence depends upon their ability to define themselves on a religious basis." 68 Fed. Reg. at 56,435. Indeed, Congress included in the Science, State, Justice, Commerce, and Related Agencies Appropriations Act, 2006, a provision explicitly affirming that World Vision is exempt from the nondiscrimination requirements of the Civil Rights Act of 1964, *see supra* note 3, suggesting that Congress has concluded that there is no compelling governmental interest in preventing World Vision—an overtly religious organization—from considering religion in hiring.[15]

Congress's interest in forbidding religious discrimination in employment is arguably stronger in the context of federally funded programs, because Congress may have an interest in ensuring that federal funds do not promote religious discrimination. But even so, many such programs do not impose a religious nondiscrimination requirement upon the employment practices of grantees. Title VI of the Civil Rights Act of 1964 does not prohibit recipients of federal financial assistance from engaging in discrimination on the basis of religion, 42 U.S.C. § 2000d (2000) ("No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."), although some individual programs contain nondiscrimination requirements.[16] The nondiscrimination provisions that apply to block grants administered under the Substance Abuse and Mental Health Services program, 42 U.S.C. § 290cc-33(a)(2) (2000) ("No person shall on the ground of . . . religion be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any program or activity funded in whole or in

---

[15] Indeed, an argument can be made that, because much religious discrimination resembles ideological or belief-based discrimination, and much of it involves the wish to associate with others of the same belief with no implication of disparaging persons of other beliefs, "it is inappropriate to generalize that all religious discrimination is invidious." SAMHSA Memorandum at 10 n.8. *See generally Hsu v. Roslyn Union Free Sch. Dist. No. 3*, 85 F.3d 839, 870 (2d Cir. 1996) (rejecting argument that "all forms of discrimination on the basis of religion are invidious in all contexts"); Paul Taylor, *The Costs of Denying Religious Organizations the Right to Staff on a Religious Basis When They Join Federal Social Service Efforts*, 12 Geo. Mason U. Civ. Rts. L.J. 159, 181 (2002) ("Faith is an idea. Unlike racism or other forms of 'invidious discrimination,' faith is not tied to the color of one's skin, to genetic makeup, or to one's ethnic ancestry. It is a unique blend of emotion and intellect that can be shared by anyone. When a religious group seeks to staff its church outreach program on a religious basis, it is not engaging in the sort of invidious discrimination that is viewed as immoral and thus rightly forbidden by law.").

[16] Subsequent amendments to Title VI indicate "that Congress was aware that religious organizations had been grantees under Title VI and that it did not disapprove of that practice." *Bowen v. Kendrick*, 487 U.S. 589, 604 n.9 (1988).

part with funds made available under section 290cc-21 of this title."); *id.* § 300x-57(a)(2) ("No person shall . . . on the ground of religion[] be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any program or activity funded in whole or in part with funds made available under section 300x or 300x-21 of this title."), do not apply to discretionary grants administered directly by the Secretary—leaving religious organizations that receive such grants free to consider faith in hiring. SAMHSA Memorandum at 2 n.1. Moreover, many statutes include "charitable choice" provisions, which provide that religious groups that receive federal funds retain the level of autonomy over internal governance matters that they possessed before receiving funding. *See, e.g.*, 42 U.S.C. § 290kk-1(b) (2000) ("The purpose of this section is to allow religious organizations to be program participants on the same basis as any other nonprofit private provider without impairing the religious character of such organizations, and without diminishing the religious freedom of program beneficiaries."); *id.* § 290kk-1(d)(1) ("Except as provided in this section, any religious organization that is a program participant shall retain its independence from Federal, State, and local government, including such organization's control over the definition, development, practice, and expression of its religious beliefs."); *id.* § 300x-65(a)(2) ("The purposes of this section are . . . to allow the organizations to accept the funds to provide the services to the individuals without impairing the religious character of the organizations or the religious freedom of the individuals."); *id.* § 300x-65(c)(1) ("A religious organization that provides services under any substance abuse program under this subchapter or subchapter III-A of this chapter shall retain its independence from Federal, State, and local governments, including such organization's control over the definition, development, practice, and expression of its religious beliefs."); *id.* § 604a(f) ("A religious organization's exemption provided under section 2000e-1 of this title regarding employment practices shall not be affected by its participation in, or receipt of funds from, programs described in subsection (a)(2) of this section."); *id.* § 9920(b)(3) ("A religious organization's exemption provided under section 2000e-1 of this title regarding employment practices shall not be affected by its participation in, or receipt of funds from, programs described in subsection (a).").

In sum, "Congress's application of religious nondiscrimination requirements in the employment context is quite selective, which makes it difficult to regard the government as having a compelling interest in imposing such a requirement in this particular context." 68 Fed. Reg. at 56,435. Moreover, there is nothing about the grants at issue here that suggests any unusually strong governmental interest in religious nondiscrimination in employment with respect to those receiving these grants. Indeed, the opposite is the case: Congress specified by law that an exemption from one such prohibition, contained in title VII of the Civil Rights Act of 1964, was to be applied to this very grant. Because "'[c]ontext matters' in applying the compelling interest test," *O Centro*, 546 U.S. at 431 (quoting *Grutter v. Bollinger*, 539 U.S. 306, 327 (2003)), and because "strict scrutiny *does* take

'relevant differences' into account—indeed, that is its fundamental purpose," *id.* at 432 (quoting *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 228 (1995) (emphasis in original)), our conclusion is limited to the issuance of this grant to World Vision. In reaching that conclusion, we emphasize that World Vision would satisfy the requirements of other relevant statutory exemptions from prohibitions on religious discrimination, *see, e.g.*, 42 U.S.C. § 300x-65; *id.* § 2000e-1(a), reflecting a congressional judgment that religious discrimination in hiring under such circumstances may be permissible.

In addition, the exemption that World Vision is seeking is not one directed at allowing it to exclude people from a particular religion from employment. Rather, it is directed at allowing it to hire only coreligionists. There is nothing to suggest that its wish for such an exemption is driven by animus towards people of different religions, rather than by a desire to remain an organization of coreligionists and to expand an activity that it already engages in with coreligionists and that is consistent with the kind of charitable activities that religious organizations traditionally have engaged in with coreligionists in this country. Moreover, World Vision's representations that it can remain true to its religious mission only if it is able to limit employment to coreligionists is borne out by its apparently consistent hiring practice since its founding, and we are aware of no information to indicate that its hiring practices reflect invidious discrimination. We need not resolve whether the government would have a compelling interest in enforcing the Safe Streets Act's nondiscrimination provision with respect to a differently situated grant applicant—perhaps one without such a history to authenticate its claim that homogeneity of belief is essential to its mission, or whose hiring practices implicate compelling government interests in eradicating racial or sex discrimination. In such a case, the government might well have a compelling interest in requiring strict adherence with the Safe Streets Act's nondiscrimination requirements. *Cf. Hamilton v. Schriro*, 74 F.3d 1545, 1552–53 (8th Cir. 1996) ("The Religious Freedom Restoration Act . . . establishe[s] one standard for testing claims of Government infringement on religious practices. This single test, however, should be interpreted with regard to the relevant circumstances in each case.") (quoting S. Rep. No. 103-111, at 9 (1993), *reprinted in* 1993 U.S.C.C.A.N. 1892, 1898). This, however, is not such a case.

### III.

Our conclusion here is consistent with Supreme Court precedents delimiting the government's discretion to fund religious activities.

### A.

First, to the extent the Establishment Clause prohibits government funding of evangelization or religious instruction, *see Mitchell v. Helms*, 530 U.S. 793, 836–

68 (2000) (O'Connor, J., joined by Breyer, J., concurring in the judgment) (concluding that actual use of educational materials and equipment loaned by government agency to religious and non-religious schools for religious indoctrination would violate the Establishment Clause), it does not appear that the OJP grant here would implicate that prohibition. World Vision represents that it "do[es] not proselytize, and no government funds are ever used for religious activities." Sept. 8 Letter at 3. The organization represents that that is true for all of its programs, not only those at issue here.

We are mindful that "[c]ourts occasionally have suggested that whether an organization engages in [religious] employment discrimination is a relevant factor in determining whether the organization is so 'pervasively sectarian' that it is constitutionally prohibited from receiving funds directly from the government." *Coreligionists Exemption*, *supra* note 8, at 19 & n. 39 (Oct. 12, 2000) ("*Coreligionists Exemption*") (citing *Roemer v. Bd. of Public Works*, 426 U.S. 736, 757 (1976) (plurality opinion); *Tilton v. Richardson*, 403 U.S. 672, 686–87 (1971) (plurality opinion); *Columbia Union Coll. v. Clarke*, 159 F.3d 151, 166 (4th Cir. 1998); *Minn. Fed'n of Teachers v. Nelson*, 740 F. Supp. 694, 720 (D. Minn. 1990)). "But while religious discrimination in employment might be germane to the question whether an organization's secular and religious activities are separable in a government-funded program, that factor is not legally dispositive." *Coreligionists Exemption* at 20 (citing *Columbia Union Coll.*, 159 F.3d at 163)). To the contrary, "it is possible that a particular organization's overall purpose and character could be 'primarily religious' . . . , but that it could nevertheless assure that its 'privately funded religious activities are not offered as part of its [government-funded] program.'" *Id.* at 19 (quoting *Department of Housing and Urban Development Restrictions on Grants to Religious Organizations that Provide Secular Social Services*, 12 Op. O.L.C. 190, 199 (1988)) (emphases deleted). Department of Justice regulations provide, with exceptions not relevant here, that "[o]rganizations that receive direct financial assistance from the Department . . . may not engage in inherently religious activities, such as worship, religious instruction, or proselytization, as part of the programs or services funded with direct financial assistance from the Department." 28 C.F.R. § 38.1(b)(1) (2006). World Vision represents that it will administer the Vision Youth and Community Mobilization Initiative programs without proselytizing and that "no government funds are ever used for religious activities." Sept. 8 Letter at 3. We see no reason to assume that the organization will not comply with the regulation, and the Supreme Court's recent decisions seem to question the notion that "pervasively sectarian" institutions presumptively will divert government funds to impermissible purposes. *See Mitchell*, 530 U.S. at 829 (plurality opinion) ("[N]othing in the Establishment Clause requires the exclusion of pervasively sectarian schools from otherwise permissible aid programs . . . . This doctrine, born of bigotry, should be buried now."); *id.* at 857 (O'Connor, J., joined by Breyer, J., concurring in the judgment) ("To establish a First Amendment violation, plaintiffs must prove that

the aid in question actually is, or has been, used for religious purposes."); *id.* at 858 ("[A]n absolute bar to the aid in question[,] regardless of the religious school's ability to separate that aid from its religious mission, constitutes a 'flat rule, smacking of antiquated notions of "taint," [that] would indeed exalt form over substance.'") (quoting *Zobrest v. Catalina Foothills School Dist.*, 509 U.S. 1, 13 (1993)); *Bowen v. Kendrick*, 487 U.S. 589, 624–25 (1988) (Kennedy, J., concurring) ("The question in an as-applied challenge is not whether the entity is of a religious character, but how it spends its grant.").

## B.

Our conclusion also is consistent with the Supreme Court's decision in *Locke v. Davey*, 540 U.S. 712 (2004), in which the Court rejected a Free Exercise Clause challenge to a state scholarship program that prohibited recipients from pursuing a "degree in theology" while receiving the scholarship. *Davey* was decided after *Smith* and did not purport to apply the "substantial burden" test embodied in *Sherbert* and adopted by RFRA. It concerned a condition attached by a state to the use of public funds, to which RFRA is inapplicable, *City of Boerne*, 521 U.S. 507, and from which the state had chosen not to exempt any recipients on the grounds of religious belief. *Davey* thus did not address the circumstances under which the federal government, which is subject to RFRA, could avoid making an accommodation for religious exercise. Rather, *Davey* held that the state was permitted to impose such a restriction on the use of public funds, even though the restriction was not religion-neutral, because of the state's specific interest in, and historical tradition of, denying taxpayer support to religious instruction. 540 U.S. at 722 ("[W]e can think of few areas in which a State's antiestablishment interests come more into play."); *id.* at 723 ("[R]eligious instruction is of a different ilk."). That concern is not implicated here, because World Vision does not use public funds to engage in religious instruction, much less the training of clergy. Sept. 8 Letter at 3.

Furthermore, the Court found the burden imposed by the condition in Davey to be de minimis. The scholarship program did "not require students to choose between their religious beliefs and receiving a government benefit," 540 U.S. at 720–21 (citing, among other authorities, *Sherbert*, 374 U.S. 398), because recipients could "attend pervasively religious schools," could "take devotional theology courses" while there, *id*. at 724–25, and could "still use their scholarship to pursue a secular degree at a different institution from where they are studying devotional theology." *Id*. at 721 n.4. Thus, in the Court's view, the condition attached to the scholarship did not require the recipient to modify his religious behavior; rather, he could take the scholarship money and study devotional theology, so long as he did not use the money to pursue a degree in that field. By contrast, as explained above, it does not appear that World Vision's programs could be revised to conform to the Safe Streets Act's nondiscrimination provision

without losing their nature as exercises of religion protected by RFRA. The burden that would be imposed here is not de minimis.

### IV.

We conclude that RFRA is reasonably construed to require OJP to exempt World Vision from the Safe Streets Act's religious nondiscrimination provision in awarding World Vision a grant pursuant to the JJDPA. World Vision is an entity protected by RFRA; its programs at issue here are an exercise of religion; OJP reasonably may conclude that imposing the nondiscrimination requirement on World Vision would substantially burden the organization's religious exercise; and, in this case, the burden would not be justified by a compelling governmental interest. We conclude that OJP would be within its legal discretion, under the JJDPA and under RFRA, to accommodate World Vision in this manner, consistent with the President's direction that "a faith-based organization that applies for or participates in a social service program supported with Federal financial assistance may retain its independence and may continue to carry out its mission, including the definition, development, practice, and expression of its religious beliefs," Exec. Order No. 13279, § 2(f), and that religious organizations that administer federally funded social services be exempted from restrictions on religious hiring under RFRA where it is reasonably construed to require that result.

JOHN P. ELWOOD
*Deputy Assistant Attorney General*
*Office of Legal Counsel*